# DECISIONS

#### — OF THE —

# SUPREME COURT OF FLORIDA.

## JANUARY TERM, A. D. 1891.

JACKSONVILLE, TAMPA & KEY WEST RAILWAY COM-
PANY, APPELLANT, VS. PENINSULAR LAND, TRANS-
PORTATION AND MANUFACTURING COMPANY, AP-
PELLEE.

1. An assignment of error which is submitted "without argument"
   may be treated as abandoned.

2. The purpose of the practice act of February 8, 1861 (sections 18-
   21, page 516, McClellan's Digest), in authorizing interrogatories
   to be propounded in an action at law to the opposite party, and
   requiring such party, or in case of a body corporate, its officers,
   to answer the same in writing by affidavit, was to enable par-
   ties to obtain testimony without having to resort to tardy and
   expensive procedure of a bill of discovery in equity.

3. The extent of the examination of an adverse party by interroga-
   tories under the practice act of February 8, 1861, (sections 18-
   21, page 516, McClellan's Digest), is subject to the same limita-
   tions as an examination by a bill of discovery in equity in aid

of an action at law. The examination must be simply in support of the case or defense of the party propounding the interrogatories, and cannot extend to the whole case.

4. Whether the provisions of the practice act of February 8, 1861, authorize interrogatories to be propounded in an action at law, does away with the equity jurisdiction or practice for obtaining discovery in aid of such an action, not decided. Authorities *pro* and *con* cited. This statute was not repealed by the act of February 4, 1874, (section 24, page 518, McClellan's Digest), removing the common law disability to testify on account of interest in, or being a party to, a cause.

5. The answers of an officer of a corporation to interrogatories for discovery filed in an action at law, are admissible as evidence against the corporation on the trial of the cause.

6. An objection by a corporation to the introduction in evidence of answers of an officer to interrogatories filed therein for discovery, on the ground that the officer was not one of such grade or character as should have answered, such objection not being made until the trial is on, nor supported by evidence, is properly overruled.

7. A railroad company which has possession of and is actually operating a railroad, and holds itself out to the public as the operator, is liable for damages occasioned to third persons by the negligence of its officers or agents in the management or operation of the same, whether its possession thereof be legal or illegal.

8. Where a railroad company operates and controls a railroad in its own name and through its own officers and employees, it is liable to a third person for an injury resulting to him from negligence in the management or operation of the same, and no exemption from such liability is caused by the fact that its possession and operation of the road are under an agreement between such company and the owner of the road, by the terms of which the company is to operate the road in its own right, furnish the rolling stock and to charge for the use of the

same, and also charge a certain per cent. of its own expenses as the operating expenses of such road.

9. The burden of proving negligence is on the party alleging it.

10. The mere emission of sparks from a railroad locomotive, or the mere setting out of fires thereby, is not, *per se*, evidence of negligence upon the part of the company; but when the emission is of such character as is inconsistent with the common experience or the known efficiency of approved spark arresters in general use, and properly used, it is evidence of negligence. The emission of sparks of unusual size, or both of unusual size, and in unusual quantities, is evidence sufficient to raise the presumption of negligence, and throw upon the company the burden of removing such presumption.

11. Where in an action for negligently setting out fires and burning property, the testimony in behalf of plaintiff shows an escape of sparks of extraordinary size, and in unusual quantities, or far in excess of anything likely to occur in the ordinary operation of a locomotive duly supplied with modern appliances approved by the test of use, and properly managed by competent operatives, and the evidence in behalf of the defendant shows that the engine was in good condition, and supplied with proper appliances for arresting the escape of sparks, and was properly managed by competent operatives, which circumstances are relied on by defendant as showing due care in the operation of the locomotive, and the evidence further shows that sparks of the size and quantity indicated could not have escaped where the engine so supplied with proper appliances is properly managed, and there is a verdict in favor of the plaintiff, and, in effect, affirming negligence upon the part of the defendant, such finding will not be disturbed by an appellate court. The testimony upon the issue of negligence *vel non*, is palpably irreconcilable and makes a question dependent entirely upon the credibility of witnesses, and peculiarly for the decision of the jury.

12. The degree of care required to be used in any given case to avoid the imputation of negligence, must be according to the cir-

cumstances or in proportion to the danger; such care as is ordinarily sufficient under similar circumstances to avoid danger and secure safety.

13. A charge that a railroad company is required to exercise the utmost care in running through a town or village where buildings are constructed of wood and situated so near to a railroad as to be exposed to fire that may come in large quantities from the locomotive, and especially so if at the time the wind is blowing in the direction from the engine toward the buildings; and that under such circumstances the company is bound to exercise a greater degree of care than when running trains in the country where there is no property near the track exposed to fire, and that the degree of care which is required is proportioned to the danger to be apprehended of inflicting injury on the person or property of others, does not prescribe a greater degree of care than the circumstances stated in it call for.

14. A charge that railroad companies are required to furnish their locomotives with spark arresters of the best mechanical invention and construction in general use at the time, is not erroneous.

15. The negligence of one, for whose acts the plaintiff is not responsible, however much it may have contributed to the injury for which the plaintiff sues, is no defence in behalf of a defendant whose negligence is the proximate cause of such injury. The fact that both the defendant and such stranger are each, on account of his own negligence, liable to the plaintiff, is no defense to either such defendant or stranger.

16. Charges on the subject of contributory negligence are not objectionable on the ground that their effect is to exclude from the jury the consideration of negligence of third persons with whom or for whose acts or negligence the testimony fails entirely to show any privity or responsibility upon the part of the plaintiff.

17. A person having property adjacent to a railroad is not bound to keep his property in such a condition as to guard against the

negligence of the railroad company, but every person has the right to enjoy his property in the ordinary manner; and while one is charged with the duty of saving his property when he can do so, he is under no obligation to stand guard over it, continually watching it, to protect it from the negligence of a railroad company.

18. The fact that a person's property is exposed to the reach of sparks of a locomotive engine is no defense to an action for an injury occasioned by the railroad company's negligence in setting out fire.

19. A person has the right to construct buildings on any part of his property, and to enjoy the same without rendering himself liable to the negligence of a railroad company.

20. Assuming, but not deciding that the negligence of a lessee or hirer of property in not saving it, or any part of it, may, under some circumstances, preclude the lessor or owner from receiving from the person whose negligence was the proximate cause of a fire by which it was destroyed, the rejection of charges to such effect is immaterial to the defendant when the testimony shows that the lessee not only endeavored to save, but actually saved, some of the property, and does not show that he was negligent in not saving other property than that which he did save, but there is not sufficient testimony in the record to have enabled the jury to find that any particular property destroyed could have been saved by him in the exercise of due diligence.

21. Where the fire resulting in the injury complained of is shown to have been set by a particular locomotive, evidence of former fires set out by the same engine is admissible as tending to prove its defective construction or condition, or improper management, but fires set out by other locomotives are inadmissible because irrelevant.

22. Error cannot be assigned on the mere admission of testimony claimed to be irrelevant, which was not objected to on that ground in the trial court.

23. Where testimony of a witness is objected to as irrelevant on his

direct examination, but does then not appear to be so, and afterwards on the cross-examination it is shown to be so, and there is no motion made to strike out the direct testimony, error cannot be assigned on the mere admission of the direct evidence.

24. It is within the discretion of a trial court to permit a plaintiff who may before resting, have introduced enough testimony to make out a *prima facie* case, to introduce after the defendant has rested additional proof in chief, as distinguished from proof in rebuttal, and the exercise of this discretion is not assignable as error except in case of manifest abuse.

TAYLOR, J. :

25. In a suit for damages for the destruction of property by fire alleged to have been negligently allowed to escape from defendant's railroad engine, the question whether the fire that escaped from such engine was the direct or proximate cause of the destruction of plaintiff's property, is one of fact for the jury to determine from the evidence.

26. In such a suit if the evidence shows that sparks, negligently permitted to escape from the defendant's engine, caused the original fire, and that its natural and continuous spread could not have been arrested by the plaintiff in the exercise of proper care until it reached and destroyed his property, and that its destruction of his property was not caused by new or intervening force, then, upon the question of direct or proximate cause, it does not matter whether the buildings destroyed of the plaintiff's were the first or the tenth to be consumed by such fire.

27. Proximate cause is that which naturally leads to or produces a given result; such a result as might be expected directly and naturally to flow from such cause; such a result as naturally suggests itself to the mind of any reasonable and prudent man as likely to flow out of the performance or non-performance of any act.

28. To entitle a party to recover for property destroyed through the negligence of another, the negligence complained of must be shown to be the proximate cause of the injury sustained.

29. Instruction of law by the court to the jury must be predicated upon some evidence that has been introduced at the trial, and it is not error to refuse to give instructions that are mere abstract propositions of law, that are not made applicable to the case by some color of evidence.

30. It is not error to refuse to give instructions upon propositions of law that are substantially embraced in and covered by other instructions already given, though couched in different language.

31. "Everyone is liable for all of those injurious consequences that might have been foreseen and expected as the result of his conduct, but not for those that he could not have foreseen, and was therefore under no moral obligation to take into his consideration." This rule from 3 Parsons on Contracts (7th edition), page 180, cited with approval.

32. The measure of damage in cases where the property of one has been destroyed, unintentionally, but by the negligence of another, where there is no element of wilfulness or maliciousness in its destruction, is just compensation in money for the property destroyed; such an amount as will fully restore the loser to the same property status that he occupied at the time of the destruction. To arrive at the amount of such compensation, inquiry, in the absence of malice, is it to be confined strictly to the ascertainment of the value of the property destroyed, with interest thereon for the retention of such value from the date of the destruction.

33. In ascertaining the value of property destroyed in such a case, where it has a well-known or fixed market value at the time and place of its destruction, the claimant must be confined to the proof of such market value, unless the property destroyed is of a well-known kind in general use having a well-recognized standard value wherever found; in the latter case the

proofs should not be circumscribed within the limits of the market demand at the time when, and at the place where it was destroyed.

34. In actions of this kind where the value of the properties destroyed is the criterion of the amount of damage to be awarded, and the property destroyed had no market value at the place of its destruction, then all such pertinent facts and circumstances are admissible in evidence as tend to establish its real and ordinary value at the time of its destruction; such facts as will furnish the jury, who alone determine the amount, with such pertinent data as will enable them reasonably and intelligently to arrive at a fair valuation. And to this end, the original cost of the property; the manner in which it has been used; its general condition and quality; the percentage of its depreciation since its purchase, or erection, from use, damage, decay, or otherwise, are all elements of proof proper to be submitted to the jury. So also in such cases it is proper to introduce the opinions of witnesses who are acquainted with the ordinary standard values of such properties.

35. Interest upon the amount of the value of the property destroyed from the time of its destruction through negligence is a material and necessary element of damage as complete compensation, and it is proper for the court to instruct the jury to allow it.

36. Notice to an agent, to be binding upon his principal, must be concerning some fact within the scope of the powers and duties of the agent as such.

37. An improper charge that was not material to the case, and that could not reasonably affect the issues in the minds of the jury, though erroneous, is not enough to reverse the judgment appealed from.

38. Negligence may be inferred from circumstances adduced in evidence; and circumstantial evidence alone may authorize the finding of negligence.

39. A witness on going to the scene of the origin of the fire, out of which the pending action arose, heard a stranger to the action

say how, according to his understanding, the fire originated, but the trial court refused to permit him to state what the stranger said: *Held*, not error. The testimony was hearsay.

40. The trial court permitted a witness, who was present at the origin of the fire out of which the action rose, to testify that he had said at the time, "that if there were any coals under the plank walk we would have a blaze" : *Held*, to be error, but, in view of other testimony in the cause corroborating the correctness of the remark, error without injury.

Appeal from the Circuit Court for Orange county.

### STATEMENT.

The charges referred to in the following opinion as numbered 3rd and 20th, are as follows :

3rd. That the question of negligence is one for the jury to determine; that if the jury believes from the evidence that the property of the plaintiff was destroyed by fire, and that said fire was the primary result of the negligence of the defendant, either in not having proper appliances on his engine, or if he did have them, in not having them so adjusted as to prevent the escape of the sparks in unusually large quantities calculated to ignite combustible material, then the defendant is liable to the plaintiff; that it is for the jury to decide whether the burning of the plaintiff's property was the direct consequence of fire caused by sparks from defendant's engine; that if the jury believe the fire where it originally started was caused by sparks from the defendant's locomotive, and that said fire spread, whether from the force of the elements or the inflammable character of the buildings, and burned

continuously from building to building to plaintiff's buildings and destroyed them, and that the plaintiff either had no power to arrest the flames, or was not present and consequently could not do anything towards arresting the flames, the jury have the right to conclude that the fire set by the defendant's engine was the proximate cause of the destruction of the plaintiff's property.

20th. That the defendants are required to exercise the utmost care in running through a town or village where buildings are constructed of wood and are situated so near to their road as to be exposed to fire that may come in large and dangerous quantities from their locomotive, and especially so if at the time the wind was blowing in the direction from the engine towards the buildings. Under such circumstances the defendants are bound to exercise a greater degree of care than would be required of them when running trains in the country where there is no property near their track exposed to fire, and for the want of such care fire in large, unusual and dangerous quantities is permitted to escape from the smokestack of their engine, and such fire is communicated and they are consumed, the defendants are liable for the damage sustained thereby, unless the negligence of the owners of the building in caring for and protecting their property concurred in producing the result; that a degree of the care which is required of the defendant is to be proportioned to the danger to be apprehended of inflicting injury on the person or property of others, and the de-

fendant controlling the engine was bound to exercise the utmost vigilance while operating his engine on the streets of a village lined with wooden buildings, and if from the faulty construction of the engine, or from the want of proper appliances upon it to prevent the escape of sparks in large and dangerous quantities and of unusual size, or if from the failure to have such appliances so adjusted as to prevent the escape of sparks in large and dangerous quantities and of unusual size, or if from an unskillful management of the engine, or from want of such care the property of the plaintiff is destroyed, the defendant is liable.

The other facts are stated in the opinion.

*J. R. Parrott, Robt. W. Davis, Hammond & Jackson,* and *T. M. Day, Jr.,* for Appellant.

### STATEMENT.

This is an action in tort, brought by the Peninsular Land Transportation and Manufacturing Company against the Jacksonville, Tampa and Key West Railway Company for the alleged burning of plaintiff's property (houses and personalty) in the town of Tavares on the 9th day of April, 1888, by sparks alleged to have been emitted from an engine running on the Sanford and Lake Eustis Railway, alleged to be managed, operated and controlled by the Jacksonville, Tampa and Key West Railway Company.

The suit was brought in Lake county to December Rules, 1888, for the sum of seventy-two thousand one

12 .　　　　SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

hundred dollars.　Before trial was had in the county of Lake, the railway company moved for change of venue on the grounds shown in the record, which motion was denied by the court.　The case went to trial at Tavares, in Lake county, and a mistrial was had. Thereafter and on February 5th, 1890, a motion was made by plaintiff, the Peninsular Land Transportation and Manufacturing Company, for change of venue on the grounds shown in the record, and the change was ordered by the court and the case sent to Orange county, where it was tried and a verdict given and judgment rendered against the defendant railway company on May 28th, 1890, for $52,909.03.　From this judgment this appeal was taken.

### BRIEF.

1st.　We submit to the court, without argument, the rulings of the court below on the demurrers filed by defendant railway company to the plaintiff's declaration and amended declaration.

### INTERROGATORIES FOR DISCOVERY.

2d.　We insist that the court below erred in permitting to be read in evidence the answers to interrogatories propounded by plaintiff to J. A. Larned, Superintendent of the Jacksonville, Tampa and Key West Railway Company, as appears in the 3d and 4th grounds of assignment of errors ; and to Charles C, Deming, as appears in the 5th and 6th grounds of the assignment of errors; and to C. O. Parker, as appears in the 7th ground of assignment of errors.　These in-

JANUARY TERM, 1891.    13

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

terrogatories were filed by the plaintiff under the provisions of sections 18, *et seq.*, page 516, McClellan's Digest. These sections are a part of the act of 1860, (misreferred to by McClellan's Digest as 1861,) entitled "an act to amend the pleading and practice of the courts of this state."

"A bill for discovery in aid of actions at law cannot be maintained where full discovery may be compelled by examination of adverse party as a witness in a suit at law." Rinderhoff vs. Platto, 29 Fed'rl Rep., 130 ; 1st Pomeroy Eq. Ju., 193, 197 ; 4 So. Rep. (Ala.) 726, and case cited.

The same principle will apply here. The act of 1860 was in aid of actions at common law, under a rule which forbade parties to testify ; it was passed to avoid the necessity for a bill for discovery ; after the passage of the act of 1874, enabling parties to testify as witnesses in their own suits, full discovery may be had of the opposite party by putting him upon the stand. The reason of the act of 1860 therefore being answered by the act of 1874 the former is abrogated. Cooley's Blackstone, Book III, 382.

We think the act of 1860 providing a mode of discovery in common law proceeding was plainly intended to supercede the necessity for going into equity merely to compel a party to disclose. It was passed at a time when parties were not permitted to testify in their own behalf and could not be compelled to testify against themselves. It was never quite fair to defendants for manifest reasons—there being no mode of

14 SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

cross-examination provided. When the act of 1874 was passed, parties at interest were enabled to testify and their testimony could thereafter be obtained upon interrogatories and cross interrogatories. Our contention is that the latter repealed the former act. They are undoubtedly inconsistent, and being inconsistent the last act is to be obeyed. Every statute must be considered with reference to the state of the law subsisting when it came into operation and when it is to be applied. "Every act is made either for the purpose of making a change in the law, or for the purpose of better declaring the law, and its operation is not to be impeded by the mere fact that it is inconsistent with some previous enactment." Potter's Dwarris, p. 155.

### FORMER FIRES.

3d. We insist that the questions propounded to the witnesses A. N. Lester, J. S. Erman, et al., by the plaintiff on the trial of this cause, as appears from the 8th to the 102d ground inclusive, of the assignment of errors, were leading, and sought to elicit testimony which was incompetent and irrelevant, and that the court erred in overruling defendants' objections thereto. These objections are manifest on the face of the questions, and we submit them without argument.

It will, however, be observed from the record that quite a number of plaintiff's witnesses were asked about the emission of sparks on former occasions. Although it is true that no particular engine is set out by number or description in plaintiff's declaration it is

true that in his declaration he refers to a particular engine leaving Tavares at a particular time and all plaintiff's witnesses testify to the fire breaking out after this particular engine had passed, to-wit: the engine pulling the train leaving Tavares on the morning of April 9th, 1888.

A. N. Lester (record p. 148) was allowed to testify, over defendant's objection, to former fires, without connecting this engine with it.

J. S. Erman (record p. 171) testified over defendant's objection, to former fires, without connecting this engine with them.

C. L. York (record p. 268) was allowed to testify, over defendant's objection, to former coals and cinders, without connecting this engine.

And so with a number of other witnesses. We contend that where the engine is specified the proof should have been confined to that engine. 60 Mo., 233, (text); 4th Maryland, p. 242 ; 32 Am. and Eng. R. R. Cases, p. 366 ; 13 Am. and Eng. R. R. Cases, p. 469.

The questions and answers of the various witnesses as to values we also present without argument as the objections as appear on the face of the questions and answers. We shall cite authorities on values and the measure of damage, and now ask to have all these exceptions to testimony considered in the light of those authorities.

### NEGLIGENCE.

4th. We insist that if the fire was set out by sparks from defendant's engine, it was not done negligently.

While from the existence of certain facts the law will presume negligence, yet the presumption may be rebutted by showing due care on defendant's part in handling its engine, and that said engine was fitted with proper appliances for arresting sparks; that such appliances were in proper order and position, and that the engine was properly handled. *Such proof will be a successful defence to the presumption of negligence arising from the escape of sparks and the setting out of fire.* Rorer on Railroads, vol. 2, p. 788, *et seq.*; Pierce on Railroads, p. 431; Redfield on Railways, vol. 1, p. 476, sec. 5; 39 Wis., p. 110, Spaulding vs. the C. & N. Ry. Co.; 33 Wis., p. 582; 61 Mo., p. 38; 93 Penn. St. Rep., p. 337; 4th Maryland, p. 242; 32 Am. and Eng. R. R. Cases, p. 330; 38 Am. and Eng. R. R. Cases, p. 349.

For testimony of plaintiff, tending to raise presumption of negligence on part of defendant by showing emision of sparks from defendant's engine, and the subsequent setting out of fire, see testimony of A. N. Lester, pp. 146 to 159; J. S. Erman, pp. 166 to 178; Van Ellison, pp. 178 to 185; J. H. Sears, pp. 185 to 192; J. M. Beauvis, pp. 253 to 261; Wesley Miller, pp. 261 to 264; J. A. Sharpe, pp. 272 to 273; John Bently, pp. 417 to 422. All this testimony is simply to the effect that sparks were emitted from defendant's engine, and soon thereafter, several small fires along the street in the saw dust were discovered, and also the fire under the sidewalk before Lester's saloon, which burned that building and caused the conflagration.

For testimony of defendant rebutting the presumption of negligence thus raised, by showing the careful handling of the engine, and the use of all proper appliances for preventing the escape of sparks, see testimony of J. E. Sullivan, pp. 463 to 475; Robt. Richards, pp. 475 to 476; P. A. Earle, pp. 476 to 486; E. W. Dunn, pp. 486 to 489.

We insist that the positive testimony of these witnesses does rebut the presumption of negligence raised by plaintiff's testimony, and that before plaintiff could recover, he must have produced according to authorities cited positive proof of defendant's negligence.

In this view of the case, it was error in the court below to charge the jury:

(a.) As in the 105th ground of the assignment of errors;

(b.) And as in the 113th ground of the assignment of errors;

(c.) And as in the 115th ground of the assignment of errors;

(d.) And as in the 116th ground of the assignment of errors;

(e.) And as in the 118th ground of the assignment of errors;

(f.) And as in the 119th ground of the assignment of errors.

### CONTRIBUTORY NEGLIGENCE.

5th. We insist that there was such contributory negligence upon the part of the plaintiff, as would prevent

its recovery, even if defendant were guilty of negligence. There is abundant evidence in the record to show that there was an accumulation of trash in the streets and under the sidewalks of the town and under the house where the fire is alleged to have occurred. The owner or keeper of the premises where the fire did occur was certainly negligent in permitting this trash to accumulate and remain there. If this negligence contributed to the injury, the plaintiff in this case can be in no better position than the person whose building first caught. 61 Mo., p. 38.

Under this view of the case the court below erred in charging the jury:

(a.) As contained in the 107th ground of assignments of error;

(b.) And as contained in the 108th ground of assignments of error;

(c.) And as contained in the 109th ground of assignments of error;

(d.) And as contained in the 110th ground of assignments of error;

(e.) And as contained in the 111th ground of assignments of error;

(f.) And as contained in the 114th ground of assignments of error;

(g.) And as contained in the 134th ground of assignments of error.

### REMOTENESS OF DAMAGE.

6th. We insist that the plaintiff's damage was too

JANUARY TERM, 1891.            19

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

remote; that in order to enable it to recover it must be shown that the fire set out by defendant was the *proximate cause* of plaintiff's damage; that the injury to plaintiff flowed directly and immediately from it. 62 Penn. St. Rep., p. 353; 38 Am. and Eng. R. R. Cases, p. 349.

(We call especial attention to the facts in this case, and the reasoning of the court.) 1 Am. Rep., p. 431; 35 N. Y., p. 210; 85 Penn. St. Rep., p. 293; 15 Conn., p. 124; Rorer on R. R., p. 814.

For evidence of plaintiff showing where fire originated, see testimony of A. N. Lester, Record, p. 146. It will be seen that the fire originated in a building not the property of plaintiff, and not in property adjacent to property of plaintiff. See also map of the town of Tavares, filed in evidence by the plaintiff. For evidence of plaintiff, showing the relative position of the property of plaintiff to the house in which fire originated, see also testimony of A. St. Clair Abrams, Record pp. 160 and 161. It will be seen from this testimony that a vacant space of 65 or 70 feet intervened between Pierce's building (one of the structures consumed by fire) and the Peninsular hotel, the first (or second) building of plaintiff which was ignited by the flames; and also that the Peninsular hotel caught from Pierce's building.

In this view of the case, we therefore insist that it was error in the court below to charge the jury:

(a.) As contained in the 106th ground of assignments of error;

20    SUPREME COURT.

J. T. & K. W. Ry. Co. v. 'P. L. T. & M. Co.—Argument of Counsel.

(b.) And as contained in the 121st ground of assignments of error ;

(c.) And as contained in the 132d ground of assignments of error.

### INTERVENING CAUSE.

7th. We insist that the plaintiff ought not to recover, because, admitting (which is denied) that the defendant set out the original fire, other causes intervened between the original fire and the plaintiff's damage. 22 Am. and Eng. R. R. Cases, p. 636 ; Bigelow on Torts, 312 ; Cooley on Torts, 70.

All the witnesses who were spectators of the fire, testify that at the time the fire began, a wind was blowing, and the witness, J. H. Sears, (Record pp. 185 to 192) swears that after the fire broke out "the wind freshened." See also testimony of Rev. W. S. Blaisdel, Record pp. 283 to 287.

There being then testimony on this point, it was error in the court below to refuse to present the law of this feature of the case to the jury, and to refuse to charge.

(a.) As requested in the 122d ground of the assignments of error ;

(b.) And as requested in the 123d ground of the assignments of error ;

(c.) And as requested in the 124th ground of the assignments of error.

### FAILURE TO SAVE PROPERTY.

8th. We insist that the plaintiff ought not to re-

cover, or in case of recovery, that the damage should have been mitigated, because the property, alleged to have been destroyed, being in the possession of its tenants or lessees, they neglected and refused to exercise ordinary care and prudence by which they might have saved plaintiff's property, or a large part of it. The court will observe from the testimony of a number of witnesses, that from the time the fire alarm was given, and the fire was discovered under Lester's saloon to the time the Peninsular hotel caught, anywhere from a quarter of an hour to a half hour or more elapsed before the hotel caught. J. S. Erman (record, p. 168,) says 25 minutes, L. P. DuPont (record, p. 530,) says 40 to 50 minutes, Rev. Mr. Blaisdell walked half a mile to Tavares after he saw smoke, and hotel had not caught when he got there and did not for some time after. See his testimony (record, pp. 283 and 286,) where he describes the situation.

Although this time elapsed, it is conceded that no property was taken out of hotel and no furniture saved or sought to be saved.

Plaintiff (appellee) seeks to excuse itself from this failure upon the ground that the hotel was in the hands of a lessee.

We cite the following authorities: 117 Mass., 533; Rorer on R. R., vol. 2, p. 793; 53 Ill., 447; 94 Ill., 448; 38 Ark., 357; 9 Am. and Eng. R. R. Cases, 222; Taylor on Landlord and Tenant, sec. 196.

In view of the evidence above referred and in the

light of the authorities cited, the court below erred in refusing to charge :

(a.) As requested in 125th ground of assignment of errors ;

(b.) As requested in 126th ground of assignment of errors.

### VALUES.

9th. The next proposition we present is the measure of the damage and values. Mr. St. Clair Abrams was permitted by the court to testify (see record, p. 295, *et seq.*,) to the furnishing of the lumber; the quality of the lumber and other material and (record, p. 308,) he was permitted to testify to the cost of the building to him. On the last page of the record referred to (p. 308) plaintiff states : ''That the evidence of cost to the plaintiff is not offered as evidence of the value ; that plaitiff admits that the value of the property at the time of the fire is the true measure of value ; that the statement of cost is put in for the purpose of enabling plaintiff to show what the value was at the time of the fire by subsequent testimony.'' It appears that what the plaintiff meant by subsequent testimony was that after he had established the cost to himself, to then show by other witnesses what the probable depreciation would have been, and, having done this, to ask a verdict upon this basis. See testimony of W. P. Floyd (record, p. 388, *et seq.*,) J. H. Sears (record, p. 432, *et seq.*,) W. A. Miller, (record, p. 447, *et seq.*,) J.

H. Sears (record, p. 454, *et seq.*,) and C. E. Pierce, (record, p. 455,) as the probable depreciation, &c. All these witnesses, it will be observed, testified in answer to a hypothetical question. That question invariably commenced thus: "What would be the cost of a building constructed on the following specifications," &c., and this hypothetical question is followed always by questions as to depreciation. In short, the theory of plaintiff, as it seems to us, was to prove cost and depreciation as his sole test of value. To all this we objected and insisted that it was not the true test.

Value in this connection is market value, and to ascertain market or true money value many considerations enter into the matter, as for instance :

(a.) What was the building used for?

(b.) Was it a home or business house?

(c.) If a business house, was it profitable?

(d.) What income was derivable from it?

(e.) Where was it located?

(f.) What of its prospects?

(g.) What were its surroundings?

(h.) What was property worth in the vicinity?

(i.) What was the land worth after the house was burned?

(j.) What were the whole premises worth in the ket as they stood at the time of the fire, etc., etc. ?

Our contention is, that all these considerations enter into the question of value and ought to have been presented by the plaintiff. With the exception of the

24    SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

testimony of Randolph, who testified on behalf of defendants, and who said that he was the lessee of plaintiff and kept the hotel, paying therefor a rental of $100 per month, there is no testimony on value, except that as to cost and depreciation.

What the plaintiff would be entitled to if he had established the negligent setting of the fire by defendant, is compensation and compensation *only*.

The general principle, undoubtedly at common law, both in action for breach of contract and tort, is to give compensation for *pecuniary injury*, that is, to put the plaintiff in the same position, so far as money can do it, as he would have been if the contract had been performed or the tort not committed. Sedgwick on Measure of Dam., vol. 1, p. 34, note; Sutherland on Dam., vol 1, p. 17; 53 N. Y., 211; Sutherland on Dam., p. 174; 13 Am. and Eng. R. R. Cases, p. 37.

We contend for the foregoing reasons, that the court below erred in admitting the testimony as to cost and depreciation as the sole test of value, and that the court erred in refusing to give to the jury the 28th, 29th and 30th charges asked by appellant and shown in exceptions 128, 129 and 130 of the bill of exceptions.

### INTEREST.

The court below charged the jury, on the subject of interest, as follows:

10th. "That the measure of damage in cases of this kind is the value of the property at the time it was

destroyed, with interest at the rate of 8 per cent. per annum," &c.  *  *  *  See 117th assignment of errors.    And again the court below charged that the jury must find interest at "eight per cent. per annum, added from the 9th day of April, 1888, to this time." See 138th assignment of errors.

The matter of interest amounted to some thousands of dollars, and becomes, therefore, a material consideration.

Our statute, McClellan's Dig. p. 585, says : "The legal rate of interest to be charged on all notes, money or liability of whatever character, and upon all judgments, shall be eight per centum per annum."

It is true, of course, that "liability" may exist in tort as well as in expressed or implied contracts, but we dot believe that the word "liability," as used in this statute, was intended to apply to liabilities in tort so as to make them interest bearing. The statute seems to be intended merely to fix the rate, and we do not understand it to impose the liability for interest unless it existed at common law, and it does not exist in tort at common law. 7 Am. and Eng. R. R. Cases, p. 493 ; 73 Mo., p. 33; 8 Fla., 161; 7 Wall., 132 ; 36 Iowa, p. 121 ; 74 Ill., p. 83 ; 63 Mo., 367, 99, 369 ; 63 Mo., 543 ; 8 Am. and Eng. R. R. Cases, 480.

An open account is a liability which would certainly come under the phrase of the statute "liability of whatsoever character," and yet this court has decided

that it does not draw interest until demand of payment or from commencement of the suit.   8 Fla. R., p. 161.

OPERATION OF THE SANFORD & LAKE EUSTIS ROAD.

11th.  We insist that there is no sufficient testimony in this record to show that appellant, the J. T. & K. W. Ry Co., operated, managed and controlled the Sanford & Lake Eustis Ry., to such an extent as to make it liable for negligence on the latter road.   If the interrogatories for discovery and the answers thereto, which we have heretofore discussed, are held by this court to have been improperly admitted, then there is absolutely no testimony sufficient for this purpose.   Therefore the court erred in refusing to charge as requested by appellant, as set forth in the 127th ground of the assignment of errors, and the court further erred in giving the 1st and 2d charges requested by appellee, as set forth in 103d and 104th grounds of the assignment of errors.

OTHER EXCEPTIONS.

12th.  From the authorities hereinbefore cited it must be evident to the court that the court below erred in refusing the charges requested by appellant as set forth in numbers 128, 129 and 130 of the assignment of errors.   These were upon the subject of values and ought to have been given.   The property involved consisted of both houses and personalty, a large part of the damage being claimed for the alleged destruction

of furniture.   No one will question that *market value* only is recoverable.

### THE WEIGHT OF EVIDENCE.

13th. We contend that the verdict was against the weight of evidence.   The testimony for plaintiff on the question of the origin of the fire; the time of its discovery ; the length of time after the departure of the train, &c., is inconsistent, irreconcilable, conflicting and unnatural.   None of the witnesses agree on material points of time.   Lester, at whose store the fire is alleged to have started, is the main witness.   His testimony will not bear scrutiny.   The fire could not have started and gained the headway claimed by him within the time that he says, to-wit :   3 to 5 minutes. Many of these witnesses are interested and admit that they have suits against the appellant.

As against all this uncertain and conflicting testimony of the plaintiff the defendant's testimony is clear, consistent and positive.   The testimony for plaintiff is circumstantial and that for defendant is positive.

We do not insist upon assignments of error numbered 112, 135, 136, 139, 140, 141, these having been included by mistake.   All other assignments are earnestly insisted upon.

28    SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

*Alex. St. Clair Abrams*, *Beggs* and *Palmer* for Appellee.

The appellee on the 9th day of April, 1888, and prior thereto, owned certain property, real and personal, in the town of Tavares, Lake county, Florida, (which property is specified in the declaration).   On the 9th day of April, 1888, and prior thereto, the appellant operated, owned, controlled and managed (as alleged in the declaration) a certain railroad, known as the Sanford & Lake Eustis Division of the J., T. & K. W. Railway, which ran from Sanford, in Orange county, to Tavares, in Lake county.   Its trains left the town of Tavares (late) that morning.   Shortly after the leaving of the train, fire broke out in said town, and all plaintiff's property was destroyed.

On the —— day of ——, 1888, plaintiff instituted suit in the Circuit Court against defendants to recover damages alleged to have been occasioned by the fire and alleging that the fire was caused by sparks emitted from defendant's engine, and alleging that the same were so emitted by the negligence of the defendant, defendant demurred and pleaded to the declaration, the demurrer was overruled.

The defendant excepted to the ruling of the court and assigns said ruling as the first ground of error.

After the demurrer was overruled the plaintiff filed an amended declaration, to which defendant demurred,

which demurrer was overruled, to which ruling the defendant excepted, and assigns the same as the second ground of error.

The grounds of the first and second demurrers are practically the same being.

First. That the declaration does not set up that the fire was the proximate cause of the defendant's negligence.

Second. That it was plaintiff's negligence in having buildings constructed of inflammable material so near railroad track.

Third. Priority of occupation as set forth in declaration is no part of this case.

Fourth. That declaration does not specifically set up. the progress of the flames.

Fifth. That the allegation that defendant owned, controlled, managed and operated the said road is not a proper allegation.

### ARGUMENT UPON DEMURRERS.

The amended declaration is copied almost verbatim from Puterbaugh's Pleading and meets every requirement of the case.

An amended declaration having been filed this court cannot consider any errors in sustaining the demurrer on the original declaration.

The first ground of the demurrer is clearly bad. The declaration on its face distinctly alleges that the

30 . SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

negligence of the defendant was the proximate cause of the fire and does not show that it was too remote for the purposes of this action. Pent vs. Toledo, Peoria & Warsaw Ry. Co., 59 Ill., 349.

The second ground of demurrer is also bad.

The defendant had a legal right to construct his buildings of inflammable material and to store within them furniture and other articles of like inflammable nature.

There is no law that requires a person's building and other property within reach of a railroad to be fire proof.

The third ground is frivolous. The allegation in the declaration in this head is simply a statement of ownership and the duration of ownership, and was made to meet the adjudications of the Supreme Court of Illinois as to buildings constructed of wood near a railroad.

The fourth ground is bad, first, because it requires plaintiff to allege in the declaration facts which are purely matters of proof; and next the declaration specifically denies that plaintiff had contributed to the negligence by declaring that plaintiff was "without fault." But even this declaration was not necessary. 38 Ill., 242 ; Puterbaugh's Pleading, 424.

The fifth ground of demurrer is also bad.

Whether the defendant managed, controlled, owned or operated the road or the engines of either plaintiff

will be liable. Puterbaugh's Pleadings, pp. 424, 430, 431.

The defendant then filed pleas to the amended declaration as follows :

First. That it was not guilty.

Second. That it did not own, manage, control or operate any railroad running from the town of Sanford to the town of Tavares, on the 9th day of April or prior or subsequent thereto.

Third. That plaintiff was not a corporation. (Abandoned at the trial and so stated to Supreme Court by counsel.)

Fourth. That plaintiff was guilty of contributory negligence.

Fifth. That if plaintiff sustained any loss it was occasioned by plaintiff's own negligence.

Upon these pleas plaintiff joined issue.

The cause was then tried upon the issues presented by the declaration and pleas.

In presenting the case we will discuss the second plea first.

The defendant in pleading avers that it did not own operate, control or manage any railroad running from the town of Sanford to the town of Tavares.

The evidence on this issue is as follows :

That defendants were operating the road and controlled and managed it, that the train on the day of the fire was operated by conductor, engineer and firemen,

all of whom were in the employ of the defendant; that all tickets were marked Sanford & Lake Eustis Division of J., K. & W. Ry. Co.; that the agent receipted for all freights as agent for defendant; that he took receipts for freights as agent of the defendant; that he received his pay from the office of defendant; (on cross examination he stated that he did not know whether such officer was also officer of the S. & L. E. Rd. Co.) that he made all reports to the officers of defendant; (see testimony of W. B. Tucker, page 192 to 194, record,) that plaintiff also showed by interrogations to and depositions of J. A. Lained, Charles C. Dening and C. O. Parker, officers of said defendant; that the road was being so operated, but in their depositions they further stated that in so operating, managing and controlling said road the defendant acted as agent for the S. & L. E. R. R. Co. And Charles C. Dening filed with his depositions a contract which he claimed was the agreement under which the defendant operated said road. On page 43 of the record as to contract, (and pages 38 to 57 as to deposition) plaintiff further showed by depositions of M. R. Moran that the S. & L. E. R. R. was operated and controlled by the defendant on 9th of April, 1888, and prior thereto, (see page 57 of the record). And it is also shown that the engine and passenger cars had the defendant's name printed upon them.

The defendant objected to the filing in evidence of the depositions of J. A. Lained, Charles C. Dening and C. O. Parker on the ground that they were not proper testimony. Objection was overruled and is here assigned as error 3, 4, 5 and 6 assignments.

These depositions were taken under the statutes. See McClellan's Digest, secs. 18 and 19, pages 516 and 517.

Under a similar statute in Massachusetts depositions were held admissible. Williams vs. Cheeney, 3d Gray, 215, also sec. 46, p. 689, General Statutes Mass., (1860); see also 1st Greenleaf Ev., 552; 3d Greenleaf Evidence, 304, as to use of answer to bill for discovery.

This statute was passed to obviate necessity of a bill for discovery, and the answers thereto as admissible in evidence.

As any other statement of party in interest. Ist Greenleaf on Evidence, 552; Day's Common Law Procedure, pp. 304, 851; Meier vs. Paulus, 70th Wis., p. 165; Goodwin vs. Wood, 5th Ala., 154; Woodruff vs. Wescott, 12th Conn., 138; Buckingham vs. Barnum, 30th Conn., 359; McFadgen vs. Mayor of Liverpool, L. R., 3 Ex. Cases, 279.

The first and second charges requested by the plaintiff and given by the court were, upon this issue, to which defendant excepted and assigned as the 103d and 104th errors, and are found on page 443 of the bill of exceptions.

3.

In support of these charges see Davis vs. P. & M. R. R. Co. 121, Mass., 134; 31 Wood's Railways, 1637, 1638, 71 Am. Dec., note, p. 297; Slosson vs. B. C. E. & N. Ry. Co., 11 Am. & Edw. Ry. Cases, 70; Bissell vs. M. S. & N. J. R. R. Co., 22d N. Y., 358; Fletcher vs. Boston & Maine R. R. Co., First Allen, (Mass.) 9. As to the right to use, operate, &c., other railroads in this State see sec. 27, p. 265, McClellan's Digest.

Liability of company operating. McClellan's Digest, sec. 132, p. 853; P. C. & St. L. Ry. Co. vs. C. M. Campbell, 86th Ill., 443; 1st Rorer Rys., p. 605; E. St. L. & C. Ry. Co. vs. Guber, 82 Ill., 632; Clary vs. Iowa Mid. Ry. Co., 37th Ia., 344; Hall vs. Brown, 54th N. H., 495; Sprague vs. Smith, 29th Vermont, 421; Wary vs. Troy & R. Ry. Co., 38th N. Y., 433; Warner vs. D. L. & W. Ry. Co., 80th N. Y., 212.

Second. The general issue raised by first plea.

The facts upon this issue are:

That plaintiff owned the property described in declaration that it was situated north of and the most of it within about 75 feet of the track used and occupied by defendant and west of the buildings occupied by Lester and Wheeler, that the buildings occupied by Lester and Wheeler were 50 to 75 feet north of the track used by the defendant company.

That the lake was south and east of the buildings, and the railroad track of defendant was between the lake and the buildings. That the weather was dry,

and the wind was blowing from the lake across the track towards the buildings. That the buildings were constructed of pine and that there was a wood side walk in front of them, which was from 3 to 6 inches from the ground, all of which was constructed prior to the railroad. That the street upon which the track was as well as most of the buildings and upon which the fire originated was known as the Tavares boulevard.

That on the 9th of April 1888, the defendant's train left the town about 30 minutes late, that when it started it did so with a jerk and attained a rapid speed before leaving the town. That the engine emitted live coals and sparks in large quantities of various sizes, from very small to the size of $\frac{3}{4}$ of an inch in length, and $\frac{1}{4}$ of an inch in width, that these coals and sparks fell around upon in and about the buildings occupied by Lester and set fire to paper inside the building. (See Lester's testimony, page 146, 147, 148, &c., of the record). They also fell in and around the store occupied by Windom & Dow, and in which Beauvis was clerking, the shower was so thick that Beauvis was compelled to get inside the building. (See Beauvis testimony, page 253,) (and further testimony as to the emission of sparks, see J. S. Emon's testimony 166; Westly Miller's testimony, p. 262; C. L. York, 264 and 265; J. A. Sharp, 272; J. W. Mangum, 278; Dock Herring, 282; John Bantley, page 418; J. H. Sears, p. 186; all these witnesses testify as to the size

and quantity of sparks). Most of these witnesses saw the train leave that morning, and further testify that it left rapidly. (See the testimony cited).

That in a few minutes after the train left, small places were seen burning in the saw dust and along the sidewalk. (See Lester's testimony, 147 ; Van Ellison, 179; J. H. Sears, p. 186, 187, 188, 189 ; J. M. Beauvis, 254, 256, 257; Westly Miller, 262; J. A. Sharp, 272 ; W. H. Latimer, 274, 276 ; J. W. Mangus, 278.

About 15 minutes after the train left, the fire broke out under the sidewalk in front of Lester's building and caught the building occupied by him and the one occupied by Wheeler as barroom, and the store occupied by Newell as dry goods store, (see testimony above cited, also testimony of W. P. Floyd, 287,) the fire then spread in a westerly northwest direction and consumed the property specified by plaintiff, the wind was blowing from the east or south of east very stormy. And all the property was consumed within an hour from the first alarm of fire, the spread was so rapid as to render it impossible to extinguish the flames, that plaintiff's building caught from the flames of the other buildings, that the fire was one of continuous duration from the beginning until the plaintiff's property was destroyed. (See the testimony above cited as well as that of W. S. Blendell.)

The defendant to meet this testimony introduced as

witnesses J. E. Sullivan, who testified that he was engineer of the train, that he left a little late, that he went out in the usual manner, and did not attain a higher rate of speed than four miles an hour before reaching the limits of the town, that he had only put on enough steam or exhaust to start the train, that the engine was No. 12, (see also depositions of J. A. Larned in behalf of plaintiff) that it was in good order, was recently from the shops that the character of the fire was green, that the spark arrester was in perfect condition and in its proper place, that he had noticed it in coming to Tavares from Sanford and in returning, and that it was in its proper place.

That he examined the engine next day and found it allright. That it would be impossible for sparks to escape from that engine from $\frac{1}{4}$ to $\frac{3}{4}$ of an inch in size, if the arrester was in perfect condition and in proper position. (See his testimony, pages 463 to 475.)

Robert Richardson, the fireman, corroborated him as to the condition of the engine and fire and the position of the spark arrester, pages 475, 476.

E. W. Dunn, conductor, testifies as to the leaving of the train and corroborates the engineer as to speed.

P. A. Earle, testified as to the condition of the engine that it had but recently left the shops, and was in good condition, as was also the spark arrester, and also described a spark arrester, also testified that if spark arresters were in proper position and in good or-

der sparks the size of your finger nail and upward could not pass through. See 485, 486.

This constitutes the evidence on behalf of the defendant on this issue.

Indirect and in rebuttal the plaintiff shows that the leaving was in usual way, that about a week before the fire the engine of defendant threw sparks into Lester's store, see Lester's testimony, also testimony of J. S. Eman. (It is shown by Larned's depositions that engine 12 had been run on the route for ten days) shows that engineer of defendant prior to that date had set out fire. W. S. Blaisdell also testifies fire along the track between where he, B., was and the fire. Walter Cooper testifies that the engine of the defendant passed his house on the way to Tavares the morning of the fire, and he saw sparks from engine and shortly afterwards the grass in his field was blazing, and he had to put it out, pages 600, 603. S. W. Davis testifies to throwing of sparks by engine three days before fire which set fire to woods and large sparks fell upon his mule. See 596, 598, also see testimony of G. W. W. Davis, pages 591, 596; James Madison, pages 599, 600; as to spark arrester see G. W. Tiny, 654.

The question on this point resolves itself to this:

That either the defendant was negligent in the management of the engine or that the witnesses for the plaintiff have testified falsely.

All these witnesses for the plaintiff testify positively

to the sparks and fire, while two of defendant's witnesses, engineer and fireman, testify that the spark arrester was in perfect position, but it is shown that it was impossible for an engine to throw such sparks if the arrester was in proper position and good condition.

It was then a question of fact for the jury to determine, and unless the verdict was manifestly against the weight of evidence the court will not disturb the verdict. Siska vs. M. & St. P. Ry., case 77th Ia. 137; Dean vs. C. M. & St. P. Ry. Co., 39th Minn., 413.

In this case the verdict certainly was in accord with the evidence and should not be disturbed.

It remains to consider the exceptions and assignment of error relating to this testimony.

8th and 9th assignments of error, page 3.

Because they do not refer to same engine witness stated that the time was a week prior and by reference to deposition of J. A. Lanied, page 230, it will be seen that engine No. 12 was on that run for ten days prior thereto.

10th to 30th assignments of error are objections to questions to sister pages 149, 150, 151, but none of the objections assign any cause, and the court will not consider them. Carter vs. Bennett, 4th Fla., 283, Gladden vs. State, 12th Fla., 562. But the objections are otherwise useless and therefore should have been overruled.

8th and 9th assignments, the engineer being identi-

fied, evidence of other fires admissable, 2d. Sherman vs. Redfield, N. Y., 675 ; The Green Ridge R. R. Co., vs. Brinkham, 64 Md., 52 ; see extensive notes in 13 Am. and Eng. Ry. Cases, p. 489, 490 ; Green Ridge R. R. Co. vs. Brinkham, 64 Md., 52 ; Burke vs. L. & N. Ry. Co., 7 Heisk., (Tenn.,) 451.

The 31st assignment is upon an objection to a question J. S. Eman, which objection assigns no ground, but even if there were grounds assigned we think the question is pertinent and admissible, page 171.

The 32d assignment of error has no ground of objection assigned, the question was made necessary by cross examination of witness Lester, as to other trains in Tavares, page 171.

The 33rd assignment is based upon objections to answer of J. H. Sears, which was a remark made by Sears to Tiny, because it was not a part of the case the remark does in no way effect this case, page 186.

The 34th and 35th and 36th assignments of error are based upon the objection to testimony of J. M. Beauvis as being improper on recall, page 291. We submit that the matter of recalling a witness is discretionary with the court below, and unless manifest error is committed or injury done, the court will not consider the same as error. 16th Fla., 368.

The 71st assignment of error is to cross examination of J. E. Sullivan, page 467, as improper, the witness

was engineer and had testified (page 463) as to the time the train left that morning, the question objected to was as to the leaving time, and the time of arrival at another point, and was certainly a proper cross.

The 72d assignment of error is to question to some witness if sparks from the size of your finger nail to ¾ of an inch long could have escaped if spark arrester were in good condition and proper place, page 474, the witness had previously testified that the arrester was in proper position and good condition, page 464, 465.

The 73rd assignment is to similar question and objection to P. A. Earlea, who had testified as stated above, page 486, he being an expert for defense.

The 74th assignment is to sustaining objections of plaintiff to question to L. F. Dupont defendant's witness as to what he heard parties say at the fire, page 530, this was purely hearsay, and the objection was properly sustained.

The 75th assignment is to a question asked witness, but to which no anwer was given, and is therefore worthless, page 536.

The 76th, 77th and 78th assignments of error, questions to G. W. W. Davis, pages 691, 696.

The 79th to 83rd, inclusive, testimony of Sam. W. Davis, 596, 598.

The 84th to 87th, inclusive, testimony of James Madison, pages 598, 600.

The 88th to 99th, inclusive, testimony of Walter Cooper, pages 600, 603.

Assignments numbered 76 to 99, are all based upon objections made to the introduction of testimony in rebuttal going to show previous fires, and that sparks fell from the same engine (of unusual size) and set fire to weeds, &c., along the line of road.

These objections were upon the ground that the testimony was improper upon rebuttal.

This class of testimony was held proper in rebuttal, in Mass., see 131st Mass. 489, 6th Allen, (Mass.,) 87 ; Sherman vs. Redfield, N. Y., 333 ; 2d Hilliard on Torts, 30, p. 351 ; 38th Am. Dec., 74 ; P. & R. Ry. Co. vs. Schurtz, 93 Pa. St., 341, 236 ; Hampton vs. Concord Ry. Co., 35 Am. and Eng. Cases, 236 ; Gulf Ry. Co. vs. Holt, 11, Am. and Eng. Ry. Cases, 72 ; Patton vs. St. Louis Ry., 23 Am. and Eng. Ry. Cases, 364 ; Slossen vs. Burlington Ry., 7 Am. and Eng. Ry. Cases, 509 ; Nashville Ry. vs. Tyre, 7 Am. and Eng. Ry. Cases, 575.

It is difficult to conceive of a stronger case of proper rebuttal testimony.

The plaintiff first shows the burning of property and that the fire was caused by sparks from defendant's engine

Defendant introduces two employees who testifies that the engine was in good condition with a spark ar-

rester of the most approved kind in proper position and perfect condition on the morning of the fire, what testimony could be more appropriate in rebuttal, than to show that on the same day the same engine caused other fires and emitted large sparks ?   It goes to rebut the testimony of defendant as to the condition of the engine, and the plaintiff not having access to the engine, this is the best evidence he could offer in rebuttal.

The 105 and 106 assignments of error as to 3d and 4th charges requested by plaintiff and given by the court upon the law of proximate cause, page 644, and the 132d to the 2d charge of the court.

In support of the charges the court are cited to : 33d N. J. E., p. 647 ; Hart vs. Western Ry. Co., 46th Am. Dec., 719 ; A. T. & S. F. Ry. Co. vs. Stanford, 13th Am. Repts., 367 ; Flinn vs. S. T. & S. J. R. R. Co., 5th Am. Repts., 57 ; Fent vs. T. P. & W. Ry. Co., 14th Am. Repts., 13 ; 38th Am. Dec., 77 note ; 2d Wood Ry., 1372 ; Clemens vs. H. & S. J. Ry. Co., Id. Am. Repts., 460 ; Safford vs. B. & M. Ry., 1038 Mass., 583 ; Pennsylvania R. R. Co. vs. Hope, 80th Penn. St., 373 ; Webb vs. R. W. & O. R. R. Co., 49 N. Y., 420 ; Lowrey vs. Manhattan Ry. Co., 99th N. Y., 158 ; Milwaukee R. R. Co. vs. Kellogg, 94th U. S., 469 ; Small vs. C. R. I. & P. Ry. Co., 90th Pa. St., 122 ; Green Ridge Ry. Co. vs. Burkham, 23. Am. and Eng. Cases, 492, 493 ; See cases cited in 13 Am. and Eng. R. R. Cases, 342 ; Kellogg vs. Chicago & N. R.,

26 Wis., 238, 288; Johnson vs. Chicago Co., 13 Am. and Eng. Cases, 460; 2 Shearman & Redfield, N. Y., 666, 667; 1 Shearman & Redfield, N. Y., 31, 32 notes, 39 notes.

112 and 115 assignments of error are to charges given by the court at request of plaintiff, as to the character of evidence necessary to establish negligence, and the 135th and 137th assignments to 5th and 7th general charges. State vs. Pacific Ry. Co., 32 Am. and Eng. Cases, 333; West vs. Chicago Ry. Co., 32 Am. and Eng. Cases, 339; Brighthope Ry. vs. Rogers, 8 Am. and Eng. Cases, 710.

These charges are more than supported by the following authorities:

2 Wood on Railways, 1345, note 1, 1347, 1348, note; 34 Am. Rep., 715; 32 Am. and Eng. Ry. Cases, 339; 19 Am. Rep., 618; 11 Am. Rep., 332; 32 Am. and Eng. Ry. Cases, 330; 32 New York, 333; 7 Am. State Rep., 66; 2 Sher. & Redf. on Neg., 676: 11 Am. and Eng. Ry. Cases, 72; 4 Am. Rep. 688; 81 Am. Dec., 354; Lanning vs. C. B. & Q., Ry. Co., 68th Iowa, 502; Lehigh Valley Ry. Co. vs. McKeene, 90th Pa. St., 122; C. & A. Ry. Co. vs. Clampit, 63 Ill., 97; 39th Ill., 456; C. & A. R. R. Co. vs. Shannon, 43 Ill., 343; C. & N. W. R. R. Co. vs. McCahill, 56th Ill, 32.

The 115, 116, 118 and 119 assignments of error are based upon charges 19, 20, 22 and 23 given by the court at the request of plaintiff. As to what consti-

tutes negligence in railway company, see 4 Am. Rep., 688; Jackson vs. C. & N. W. Ry. Co., 7 Am. Rep., 120; defect in engine negligence, 2 Wood's Railway, 1343, sec. 326; negligence in the absence of care, see 93 Am. Dec., 708; duty of the company in operating machinery, 5 Am. Rep., 58; 2 Wood's Railways 1344 and notes; 2 Thompson on Trial, 1818; duty in running through villages and close to buildings; 93 Am. Dec., 708; 22 New York, 210; 80th Penn. St., 182.

The fourth and fifth pleas raise the issue of contributory negligence.

This is an affirmative plea and the burden of proof rests upon the appellant, (defendant).

The evidence upon these pleas is :

That upon cross examination of plaintiff's witnesses and the testimony of W. B. Tucker for the defendant, it was shown that the sidewalks were in bad condition, that there was paper and straw around Lester's and Wheeler's store when the fire originated. That there was sawdust in and about the streets; that these could have been property saved from the hotel, but no effort was made (testimony of Dupont) but Randolph (the lessee) witness for defendant testified that it was impossible for him to have saved the property (see his testimony, page 586). The plaintiff proved that it had no officers or agents in the town of Tavares on the day of the fire. (See testimony of Alex St. Clair Abrams, page 165, of G. A. Butler, page 431). There does not appear in the testimony that plaintiff's prem-

ises were not in good condition. It does not appear in the record that the buildings were in good condition and that they were constructed before the railroad was constructed.

The 107, 111 and 114 assignments of error are to charges given by the court at the request of the plaintiff upon the law of contributory negligence, and to sustain those charges the following authorities are cited: (And also 133d and 134th assignments to 3d and 4th general charges). 38 Am. Dec. 74; 21 Am. Rep., 97; 22 New York, 209; Richmond and Danville Ry. Co. vs. Medley, 75th Va., 505; Burke vs. L. & N. R. R. Co., 7th Heisk, 451.

Burden of proof is on defendant. 3 Am. State Rep., 250, 245; 9 Am. State Rep., 827; 2 Woods Railways, 1372; 1 Woods Railways, 55; Small vs. C. R. I. & P. R. Co., 55, Ia., 587; Lanning vs. C. B. & Q. Ry. Co., 68th Ia., 512; P. & R. Ry. Co. vs. Schultz, 93 Pa. St., 34.

The next question to be considered is as to the value of the property and the mode of proof of the same.

Alex St. Clair Abrams, president of plaintiff company, testified that he had all the buildings constructed, was familiar with each and every of the same, knew the character of the material used in the construction of them, and knew the costs of the buildings; that he had been in the mill business for years, and had had a number of buildings constructed. He also testified that he was familiar with the buildings at the

JANUARY TERM, 1891.          47

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Argument of Counsel.

time they were destroyed, that he was familiar with the value of such buildings.

He also testified to the cost of the buildings and to the value of the same on the day they were burned.

He also testified that he purchased the furniture and other personal property, and to the cost of the same when purchased and the value of the same when it was destroyed.

(See record 303 for cost of hotel) (see page 312 cost of buildings) (see record 610 for value of hotel) (see page 312 for value of buildings) (see record 311 for cost of store) see record 311 for value of store.

See from page 303 to 331 inclusive, contains the testimony of cost and value of the various articles and buildings.

W. P. Floyd, witness for plaintiff testified as to value of certain articles of personal property, 401, 402 of the record.

As to the value of the hotel, see testimony of J. H. Sims, (page 439) W. A. Miller (page 451) C. E. Pierce, (page 560).

J. H. Sears also testified as to the value of two other buildings.

Mr. St. Clair Abrams who is the most familiar with all the property values it on the day of the fire at $55,500.   He values the hotel at $35,000.

J. H. Sears, values the hotel on the day of the fire

at $35,637.17, page 440, and valued the store houses, one at $2,500, one at $1,300, page 455.

W. A. Miller values hotel at $30,000, page 451.

C. E. Pierce values hotel at $27,964.20, page 460.

As to the furniture and condition of the hotel see depositions of J. K. & L. M. Barrett, 203 to 211 and 212, 219.

This constituted the direct testimony for the plaintiff.

The defendant introduced W. T. Cotter as an expert, who testified that he would build hotel for $18,000, but after first estimating cost of large store at $5,000 he fell to $4,000, and then to $2,500 after reflection, and the small store $1,100. See his testimony, 538 to 560.

And we ask the court to compare his testimony as an expert with that of Sears, Miller and Pierce, experts on behalf of plaintiff.

The defendant offered testimony of D. S. Randolph, pp. 561 to 590, E. S. Howell, 496 to 521, as to the condition of hotel and furniture. As well as that of Geo. A. Peck, 489, 496.

In rebuttal plaintiff introduced as witnesses in regard to the kind of furniture and its condition:

J. C. Anderson, 603 to 605.

S. B. Harrington, 605 to 613.

J. H. A. Bruce, 613 to 617.

H. F. Dobbins, 617 to 623.

J. H. Taylor, 623 to 625.

Geo. A. Butler, 626 to 628.

J. G. Sinclair, 628 to 631.  E. S. Burlegh, 632.  J. S. Eaman, 635.

A. N. Harrington, 636.

A. St. Clair Abrams, 637 to 642.

This closes the case so far as the testimony is concerned.

All this testimony having been passed upon by the jury who had all the testimony and the witnesses before them, unless the damages are in excess of the proof, this court should not disturb the verdict, and we submit to the court that the jury had an abundance of testimony before them to find in the amount which they did and the verdict should not be disturbed.

The 53d assignment of error is to the offering in evidence of certain chairs identified as coming from the hotel, these were offered to show the kind and condition of certain furniture, they being the only furniture saved from the fire.

The 37th to the 60th (inclusive) assignments of errors are to the rulings of the court upon questions to witnesses, Alex. St. Clair Abrams, as to costs and values of the property.

The objections we do not think well taken:

1st. Because the witness showed that he was qualified to testify as to the value of the property, both real and personal.  It is not necessary for a witness to be an expert in order thus to testify.  1 Sutherland Damages, 792, 795, 798; Vanlin vs. Burper, 13th Met., 288; Lanning vs. C. B. & L. Ry. Co., 68 Ia., 502; 2d Sedg-

4

wick Damages, 637, 640; Jay vs. Hopkins, 5th Denio, 84; 1st Thompson on Trials, 8,380; Continental Ins. Co. vs. Horton, 28th Mich., 173; Whipple vs. Walpole, 10th N. H., 130.

2d. Because it is competent to put in evidence the cost of buildings and of personal property, not as a measure of damage, but as a basis upon which to ascertain the value of the same at the time of destruction, the date of purchase and construction being given as well as the use to which the property has been subjected.

The 61 and 62 assignments being to testimony of Floyd, pages 401, 402, as to value of counters, Floyd was competent to testify, and the evidence admissible. He was an expert, a cabinet maker and carpenter, and familiar with articles testified to.   2d Sutherland Damages, 375; Luce vs. Jones, 39th N. J. L., 707.

63 to 70 assignments are based upon objections to questions propounded to experts, such question being upon a hypothetical question based upon the evidence of St. Clair Abrams and Floyd. The principal objection being that the question was not a proper one as it was not based upon any testimony in the case, and whether proper questions will appear by reference to the testimony.

The 100th assignment is to question to S. B. Harrington on the ground that it is leading this we submit to the court, as well as the 101st and 102d assignments to the testimony of G. A. Butler and J. G. Sinclair,

that they are not well taken, and that no error was committed in admitting the testimony.

As to the measure of damages the true rule is :

That the plaintiff is entitled to recover the actual value of the property at the time and place it was destroyed, with interest from the date of its destruction, as embraced in the 6th general charge given by the court, (138 assignment) of errors and also embraced in the 21st charge given at the request of the plaintiff (117th assignment of error), (13 A. M. St. Rep., 482, 487,) and not as embraced in the 28th, 29th, 30th and 31st charges requested by the defendant and refused by the court and assigned by the court and assigned as 128th, 129th, 130th and 131st errors, as the property was of such a character as to have no particular market value upon which to base opinions as to the market value of the same by the jury. 1 Sutherland on Damages, 173 ; Luss vs. Jones, 39 N. J. L., 707; Chapman vs. N. W. Ry. Co., 26 Wis., 302; McCormick vs. P. C. R. R. Co., 49 N. Y., 315 ; 2 Sherman & Redf. on Neg., 747, 750; Parrott vs. Housatonic Ry. Co., 4 Conn., 576; Burke vs. L. & N. R. R. Co., 7 Heisk., 451 ; Whitbuck vs. N. Y. Central, 36 Barb., 644 ; 220 Min., 343 ; 2d Sherman & Redfield, §740; May Ins., 740; 46th N. Y., 369; 8th Iredell, 239 ; 1 Sutherland, 800.

120th assignment of error is based on the refusal to give 12th charge requested by the defendant. We submit that this objection is fully met by previous charges given by the court at the request of the defendant and given by the court of his own motion.

121st assignment is upon proximate cause the law of which is fully covered by the court in other charges.

122d, 123d and 124th assignments are upon the refusal of the court to give certain charges upon proximate cause which charges are not based upon any evidence in the case and are not the law upon the subject. See authorities previously cited under this head in this brief.

125th and 126th assignments of error are based upon the refusal of the court to charge that contributory negligence of lessee, is the negligence of the lessor. There is no evidence upon which charges could be given in this case, nor is the lessor liable for contributory negligence of the lessee.

127th assignment of error is to the refusal of the court to give the 27th charge requested by the defendant, and while perhaps this charge might be good if there was any evidence whatever that the employees were the servants of the S. & L. E. R. R. Co., but all the evidence upon this point establishes that the defendant was operating the road. Furthermore there was not only no evidence that the road was solely under the control of the said Sanford and Lake Eustis R. R. Co., but all the evidence, both for appellant and appellee, showed that this was not the fact.

In conclusion, we submit to the court that the charges given by the court below were clearly correct, and that they covered all the law of this case.

That the verdict was not contrary to those charges

nor to the law.    That the damages were within limits of the proof.

The appellant insists that Eamans and York testified as to other engines.    We submit to the court that as to York there is no assignment of error.

That as to Eamans' testimony we repeat that no ground of objection is assigned.

That the verdict was in accord with the evidence and weight of evidence, and that unless there were manifest errors therein the verdict should stand.

(Judge Mitchell, of the Sixth Circuit, sat in the place of Mr. Justice Mabry, who was disqualified.)

RANEY, C. J. :

This is an appeal from a judgment recovered against appellant by the appellees in April, 1890, for the sum of $52,909.03, and costs, in an action of trespass.

The amended declaration states : That the defendant, who is a corporation under the laws of Florida, on April 9th, 1888, owned, controlled, managed and operated a railroad from the town of Sanford, in Orange county, to Tavares, in Lake county, in this State, known as the Sanford & Lake Eustis Division of the Jacksonville, Tampa & Key West Railway Company, and that at the same time, and at the time of the construction of the said Sanford & Lake Eustis road, the plaintiff, a body corporate under the laws of this State, was the owner of certain buildings in Tavares, to-

wit: The Peninsular Hotel, of the value of $40,000; a store building on Tavares Boulevard, at the corner of New Hampshire Avenue, of the value of $6,000, and another store building, on the same boulevard, and near the same avenue, of the value of $2,000; one livery stable, valued at $1,500; one cottage on East Ruby street, valued at $600; another at the corner of the same street and Joanna avenue, valued at $500; two other cottages on the same avenue, valued respectively at $500 and $400, and one on Texas Avenue, valued at $400; and that the plaintiff was at the time stated the owner of the following personal property, viz: The furniture and entire outfit of the hotel, of the value of $16,000; the counters, shelves, cases, &c., in the first-named store, of the value of $1,000; chairs, tables, maps, desks, life-preservers and harness, of the value of $1,000; one outfit of printing material, of the value of $1,200; the buildings, tenements and personal property, aggregating in value the sum of $72,100. That the railroad was constructed along Tavares Boulevard within 150 feet of plaintiff's stores and hotel, and within 1,000 feet of all the other above-described property, and that defendant, although well aware of the inflammable nature of the material of which the buildings, tenements and personal property was composed, and of their liability to take fire, negligently and carelessly permitted their locomotive engines, operated and controlled by their agents, servants and employees, to be run along the said boulevard without taking necessary and proper precaution to prevent sparks of fire escaping

from the smoke-stack of the locomotive engines, thereby endangering the property of the plaintiff to destruction by fire, and that on the morning of the day aforesaid the defendant's train of cars, drawn by one of its locomotive engines, and controlled, managed and operated by one of its employees, agents and servants, started from the said boulevard for Sanford, the said locomotive not having a spark-arrester therein (if there was any spark-arrester at all) so arranged as to prevent the escape of sparks from the smoke-stack, and the defendant having negligently, recklessly and carelessly omitted and failed to exercise due care and precaution to prevent the escape of sparks of fire from the smoke-stack of said locomotive engine, and not exercising due care and diligence in managing, controlling and operating the locomotive, it, the said locomotive, there being at the time of leaving said boulevard, and before, a high wind blowing, threw out from its smoke-stack a considerable number of sparks and blazing fragments of wood, which then and there set fire to a certain wooden sidewalk on said boulevard, and the fire was communicated to the adjacent buildings, including the plaintiff's said buildings, tenements and personal property, and plaintiff's properties aforesaid were, all and each of them, totally destroyed by said fire, the plaintiff being without fault, and unable to arrest or prevent the spread of the fire, which fire was caused by the gross negligence of defendant in not exercising due care and precaution in preventing the escape of the sparks from the locomotive, the plaintiff claiming $75,-000 damages.

A demurrer was filed to this declaration, but the general assignment of errors that the action of the court overruling it was erroneous, having .been submitted "without argument," we may treat the assignment as abandoned. We may remark, however, that we perceive no defect in the declaration.

The demurrer having been overruled, the defendant filed five pleas :

1st. Not guilty.

2d. That it did not own, manage, control or operate a certain railroad, or any railroad, running from the said town of Sanford, to that of Tavares, and known as the Sanford & Lake Eustis Division of the Jacksonville, Tampa & Key West Railway, and was not the owner, manager, controller, or operator of any such railroad on the 9th day of April, 1888, or at any time prior or subsequent to this date.

3d. The plaintiff is not a corporation as alleged.

4th. That the plaintiff by its own acts so contributed to its own loss and injury that it has no right of action.

5th. That whatever loss or damage the plaintiff may have sustained, as set forth in the declaration, was by its own fault and negligence.

Issue was joined on these pleas, but the third plea has been abandoned in this court.

The questions to be considered next arise under the issue made by the second plea.

The plaintiff delivered to the defendant's attorney on July 30th, 1889, interrogatories for discovery, ad-

dressed "to the superintendent" of the defendant
company, "an officer of said body corporate," and
other interrogatories addressed to Charles C. Deming,
secretary of the defendant company, "an officer of said
body corporate," such interrogatories being accom-
panied by a notice to such attorney, requiring that the
interrogatories should be answered by affidavit within
ten days.   Answers to the former interrogatories were
made by one J. A. Larned, (he swearing that he is
superintendent of the company), on the 31st day of the
following month, and to the latter by Deming, the
secretary, two days before, and on the 12th of Septem-
ber, other interrogatories addressed to the same secre-
tary were served, and he answered them on the first
day of October, and afterwards on a subsequent day
in the same month filed an amendatory answer.
Cotemporaneously with the last mentioned interroga-
tories, there were served others addressed to "the
superintendent" of the defendant company, "an offi-
cer of said body corporate," which were answered
October 4th, by one C. O. Parker, who states, among
other things, in his affidavit, that he is the assistant
general manager of the defendant company.   On the
25th of the last named month the plaintiff by notice
addressed to the defendant company, and to J. A.
Larned, superintendent thereof, required them to an-
swer accompanying interrogatories addressed to J. A.
Larned, such superintendent, and he answered them
early in the succeeding month.

Upon the answers, with the interrogatories, being

offered in evidence, they were objected to, but the court overruled the objection and permitted them to be read, and this ruling is assigned as error.

The interrogatories were filed under certain provisions of "an act to amend the pleadings and practice of the courts of this state," approved February 8th, 1861, secs. 18, 19, 20, 21, McClellan's Digest, pp. 516, 517. The 18th and 19th of these sections are as follows:

"18. In all causes in any of the courts of the state the plaintiff may, with the declaration, and the defendant may, with the plea, or either of them may, at any other time, deliver to the opposite party or his attorney interrogatories in writing upon any matter as to which discovery may be sought, and require such party, or in case of a body corporate any of the officers of such body corporate, within ten days to answer the questions in writing by affidavit, to be sworn and filed in the ordinary way; and any party or officer omitting, without just cause, sufficiently to answer all questions as to which a discovery may be sought within the above time, or such extended time as the court or a judge may allow, shall be deemed to have committed a contempt of court, and shall be liable to be proceeded against accordingly."

"19. In case of omission, without just cause, to answer sufficiently such written interrogatories, it shall be lawful for the court or judge, at their or his discretion, to direct an oral examination of the interrogated

party, as to such points as they or he may direct, either before the court or judge or clerk, and the court or judge may, by such rule or order, or any subsequent rule or order, command the attendance of such party or parties before the person appointed to take such examination for the purpose of being orally examined as aforesaid, or the production of any writings or other documents to be mentioned in such rule or order, and may impose therein such terms as to such examination and the costs of the application, and of the proceedings thereon and otherwise, as to such court or judge shall seem just."

The 20th section is as to the return of depositions taken under the preceding section, and authorizes office copies to be given to the opposite party. The other section is as to reports by the examiner and costs.

It is contended that these sections have been repealed by the act of February 4th, 1874, entitled "an act in relation to testimony in civil actions," Chapter 1983 of the statutes, sec. 24, p. 518, McClellan's Digest, which statute enacts that no person offered as a witness in any court, or before any officer acting judicially, shall be excluded by reason of his interest in the event of the action or proceeding, or because he is a party thereto; providing, however, the parties to, and those interesting in the event of an action, their assignees and those under whom such parties, or interested persons claim, shall not testify as to any transaction or communication between such a witness and

a person then deceased or lunatic, against the repre
sentative or assignee of such deceased person, or the
assignee or committee of such insane person, unless
such representative, assignee or committee shall be ex-
amined in his own behalf as to such transaction or
communication, or unless the testimony of such de-
ceased person or who may have become lunatic, shall
be given in evidence.

The purpose of the act of 1861 was to enable parties
to actions at law to obtain "discovery" without hav-
ing to resort to the expensive and tardy procedure by
bill in equity for such purpose. In Wilson vs. Web-
ber, 2 Gray, 560, it is said of a substantially similar
statute : The main purpose of these provisions was to
substitute in place of the tedious, expensive and com-
plex process of a bill of discovery on the equity side
of the court, an easy, cheap and simple mode of inter-
rogating an adverse party, as incident to and part of
the proceedings in the cause in which the discovery
was sought. It was not intended to make the parties
to a cause witnesses, who might at the pleasure of the
party interrogating, be made to testify respecting the
whole case, but only to give a limited right to obtain
evidence from an adverse party in analogy to the well
settled rules regulating bills of discovery in the court
of chancery in England. See also Bayley vs. Griffiths,
1 H. & Co., 429. In Williams vs. Cheney, 3 Gray,
215, 217, 220, where the defendants proposed to read
in evidence the answers of the plaintiff to interroga-
tories filed by the defendants to another suit pending

in the same court, but in which the issues were not the same as those in that in which it was proposed to read them, it was held that such answers were competent evidence so far as they contained admissions by him of facts material and relevant to the points in issue in the latter action; and it is said of the statute, that its provisions secure to parties the right to make complete statements of all facts in relation to which they may be interrogated in any suit, and guard them against being compelled to make partial and garbled disclosures in answer to artfully contrived questions. There can, therefore, be no danger or hardship in allowing such statements to be used in evidence in like manner as other admissions of a party to a suit, fairly made, are ordinarily admitted against them.

Whether or not this act does away with the equity jurisdiction or practice for obtaining discovery in aid of actions at law, we need not decide, as no such proceeding in equity is before us. The authorities cited in the books against the idea of an abrogation of the equitable jurisdiction or practice are: Cannon vs. McNab, 48 Ala., 99; Continental Life Ins. Co. vs. Webb, 54 Ala., 688; Buckner vs. Ferguson, 44 Miss., 677; Millsaps vs. Pfeiffer, Ibid, 805; Kearney vs. Jeffries, 48 Ibid, 343; Shotwell vs. Smith, 20 N. J., (Eq.) 79; Hoppock vs. United New Jersey R. R., &c., Co., 27 Ibid, 286, and French vs. First National Bank, 7 Benedict, (U. S. Dist. Ct.) 488; while those relied on as against it are, Rindskoph vs. Platto, 29 Fed. Rep., 130; Riopelle vs. Doellner, 26 Mich., 102; Heath vs.

Erie Railway Co., 9 Blatchf., 316, and Brown vs. Swann, 10 Peters, 497. Assuming even that the statute last mentioned has superseded the right to use the equity practice, we are still-satisfied that the act of 1874, Chapter 1983, *supra*, has not repealed that of 1861, and for the reason that the sole purpose of discovery under the statute, nor of its prototype in equity, is not merely to obtain evidence for use upon the actual trial of the issues at law, but also to aid a party in preparing for trial. Baker vs. Carpenter, 127 Mass., 226; Blossom vs. Ludington, 32 Wis., 212; Woolley vs. North London Railway Co., Law Reports, 4 C. P. Cases, 602; Atkinson vs. Fosbroke, Law Reports, 1 Q. B. Cases; 628; Wych vs. Meal, 3 Peere Williams, 310; Vermilyea vs. Fulton Bank, 1 Paige, 37; Wright vs. Dame, 1 Metcalf, 237; Moodalay vs. Morton, 1 Bro. Ch., 469.

Though the general rule in equity is that a person who has no interest in the subject-matter of the suit, or is merely a witness, cannot be made a party defendant to a bill either for relief or for purposes of discovery, there is an exception to this rule in the case of a proceeding against a corporation, for the reason that a corporation answers under its seal, and not under oath; and a full knowledge of facts might not be obtained from it. 2 Story Eq. Jur., sec. 150, and notes; Garr vs. Bright, 1 Barb., (Ch.) 157; Fenton vs. Hughes, 7 Vesey, Jr., 287; Lindsley vs. James, 3 Cold., 477; Smith vs. St. Louis Mutual Life Ins. Co. 2 Tenn., Ch., 599; Fulton Bank vs. New York & Sharon Canal Co.,

1 Paige, 312.   Hence grew up the rule of permitting the officers of a corporation to be made co-defendants for the purposes of discovery, to enable complainants to obtain full knowledge of all facts material to their action or defence.   The answer of the officer could, however, not be used as evidence against the corporation, but it served only to enable the plaintiff to understand his rights, and direct his suit, action or defence; and the plaintiff could afterwards examine the officer or servant as a witness, when the corporation could have the benefit of a cross-examination or disprove the matters contained in his answer.   Wych vs. Meal, 3 Peere Williams, 312; Vermilyea vs. Fulton Bank, 1 Paige, 37; Many vs. Beekman Iron Co., 9 Ibid, 188.

The reason given for this inadmissibility of the answer of the officer as evidence against the corporation is the rule that the answer of one defendant in chancery cannot be used, or is not evidence against his co-defendant, the admissions of the one do not bind the other.

Though we think the purpose of this statute was not to authorize either party to examine the opposite party or officer of the opposing corporation as to the whole case, or as to such opponent's case, but simply in support of the case or defence of the party propounding the interrogatories upon the principles governing and limiting bills of discovery in chancery.   Zeigler vs. Scott, 16 Ga., 389; Thornton vs. Atkins, 19 Ga., 464; Godwin vs. Wood, 5 Ala.. 120; Pritchett vs. Munroe, 22 Ala., 501.   We do not think the same rule obtains

as to the use of the answers of an officer obtained un-
der the statute. The officer answers really for the cor-
poration, the same as any other defendant answers for
himself. The interrogatories are served on the attor-
ney of the corporation, or if not on him, they must be
served on such officer as makes it in law a legal service
on the corporation. If there is any reason or "just
cause" why the person called upon as an officer to an-
swer should not answer the interrogatories, the corpo-
ration is in position to protect itself. The answer of a
corporation under its seal could not, under the chan-
cery practice, be excepted to on the ground of its in-
sufficiency as a discovery. Smith vs. St. Louis M. L.
Ins. Co., 2 Tenn., 599. The purpose of the statute was
to obtain the same discovery of a corporation as would
have been obtainable in equity before in aid of a suit
at law if these bodies had been required to answer un-
der the oaths of their officers instead of under seal.
If an officer answers, but not "sufficiently," the stat-
ute provides the means of compelling a sufficient an-
swer. Corporations are no more at a disadvantage un-
der this rule than they are from their ordinary answers
in chancery, being prepared under the direction of
their officers. The loyalty of officers on this line can-
not be questioned so long as they tell the whole truth.

The introduction of the answers of the officers named
above were objected to on four grounds : 1st, it was
not the proper way of bringing into court the testimony
of an absent witness ; 2d, the defendant had no author-
ity of cross-examination ; 3d, that Parker is not shown

to be a part of the defendant company, and 4th, because if a mere employee of the company, it is not bound by its answers in these *ex parte* depositions.

The first and second of these objections are fully answered by what has been said above. A corporation has no more right to urge the second objection than any other defendant; it acts through its officers, and not otherwise. As to the third and fourth objections it is only necessary to say that it must be presumed, in the absence of any showing to the contrary by the company, that Parker answered by and with its consent and as its officer. There is no pretense that the interrogatories were not duly served, or that any unfair advantage or irregularity or practice was attempted against the defendant. It is true the interrogatories were not addressed to him; still the only justifiable assumption is that he was put forward by the company to answer those addressed to another, and absent officer in whose place he was acting. If he or any of these officers were of such a grade or character that they should not have answered, the objection should have been supported by some affirmative showing to that effect. Without saying more, an objection that any officer is not such one as should have answered, comes very inopportunely when the case is on trial. It is reasonable to require that it should be made before answering, and fair practice demands that the party propounding the interrogatories should not be liable to be ensnared by an answer filed as a compliance with the statute and an exception of this kind

made upon the trial, which has been entered upon in reliance upon such answers to prove a part of his case.

Regarding the answers as evidence, and considering them in connection with other testimony bearing upon the same point, it is clear that the defendant company controlled, managed and operated the Sanford and Lake Eustis road at the time of the fire in question. It is not necessary to set forth all the testimony on this point. To do so in this, or in several other questions of fact, would swell the opinion, which necessarily will be very long, beyond a tolerable measure.

It is asserted by appellant's counsel, however, that barring the answers to the interrogatories for discovery propounded by plaintiff to Larned, Deming and Parker, there is no testimony to sustain the allegations of the declaration, upon which the plea takes issue. A concise statement of the other evidence bearing on the point will show this contention to be untenable, M. R. Moran, who was the general superintendent of the defendant company from the year 1887 to March 30th, 1889, says that the Sanford & Lake Eustis Railroad, from Tavares to Sanford, was operated and controlled by the defendant during those years, and on April 9th, 1888, the day of the fire, to the best of his knowledge and belief; that the defendant company was not the owner of the road, and that the receipts were taken by the Sanford & Lake Eustis Company, and the expenses of the operation of the road were paid out of the moneys received from it so far as they went; that the engines, cars and rolling stock run upon the road

on the day of the fire, and prior thereto, were not in the name of the Sanford & Lake Eustis Company, and whether they were leased by said company belongs more particularly to the accounting department, and not to his, and he has no definite knowledge as to the matter.

W. B. Tucker, who was agent of the defendant company at Tavares in 1888, says that the line of the road ran from Tavares to Jacksonville; that the portion of the line of which he was agent at Tavares was designated or set down on the cards as the Sanford & Lake Eustis Division of the Jacksonville, Tampa & Key West Railway; that the forms, in so far as the business of his office was conducted, were all headed Jacksonville, Tampa & Key West Railway Company, and he issued freight receipts and bills in the same name; that the printed through passenger tickets were headed "Jacksonville, Tampa and Key West Railway," and there was a coupon good from Tavares to Sanford printed: "S. & L. E. Division;" that Jacksonville, Tampa and Key West trains were run on the division, that is, their engines were so labelled, and that an engine marked "J. T. & K. W." carried the train out on the morning of the fire; that he rendered his accounts to the auditor of the Jacksonville, Tampa and Key West Railway, and looked to that company for compensation for his services, and received compensation from the paymaster or cashier of that railway, and in receiving freights from other roads connecting with the line at Tavares, he receipted for them in the

name of the defendant company, and in delivering freights to such lines, delivered them in the name of the same company; that the business was thus transacted during the entire time of his agency at Tavares. On cross-examination he says: That during the same time he was acting superintendent of the T. A. & G., of which Major Alexander St. Clair-Abrams was president; and on being asked if he knew that the cashier of the J. T. & K. W., was also cashier of the S. & L. E., replied: He paid me off. I used to send my remittances to him from that division, and further said that the did not know that the cashier of the J. T. & K. W., was cashier of the S. & L. E., or how the pay rolls he signed were headed, but that he "just signed" his name. J. T. Sullivan, a witness for plaintiff, says he was a locomotive engineer on the defendant road on the morning of the fire, and ran the train that morning from Tavares to Sanford, having come into the former place with a mixed train. E. W. Dunn, another witness for the plaintiff, says he was a conductor for the defendant company on the morning of the fire, and that his run that day was from Tavares to Sanford, the making of which he describes. The testimony of Earle, the foreman boilermaker, shows that the locomotive which pulled the train that morning was one of the defendant company's locomotives.

The testimony set out above shows that the defendant company was actually operating and controll-

ing the road.   It was holding itself out to the public
as the operator and controller of it.   The road was
managed and operated by its officers and employees,
in its name, and not in the name of the Sanford and
Lake Eustis or that of any other company.   The pub-
lic is not required to look further than this.   The
statement of Moran that the "receipts were taken by
the Sanford and Lake Eustis Company, and the ex-
penses of the operation of the road were paid out of
the money received from it so far as they went," is
not inconsistent with the actual and ostensible man-
agement of the road by the defendant company, to
which he testifies.   He also fails so state who paid or
was to pay the excess of the expenses over what such
receipts "went" to pay.   No secret agreement as to
the application of the earnings to the expenses will
protect or relieve the company actually operating the
road or train from liability to those suffering injuries
by its negligence.

If we look beyond the testimony set out above to
that contained in the answers to interrogataries, we
find the secretary of the defendant company testifying
that it was operating the road "under and in accord-
ance with a memorandum of agreement between the
two companies," providing that the defendant com-
pany would operate the road until May 1st, 1888, and
pay the difference, if any, between the expenses and
receipts of the Sanford and Lake Eustis Company,
and "supply for the use of the second party," Sanford

and Lake Eustis Company, rolling stock at stated prices for the use of the same, and that two and a half *per cent.* of the general administration expenses of the defendant company, including its steamboat service, should be charged as part of the operating expenses of the Sanford and Lake Eustis Company; that interest shall be reckoned at eight *per cent.* on monthly balances, and the accounts "now outstanding between the two companies shall be computed and settled upon the foregoing basis," the agreement not to cover any advances made, or expenses incurred, by defendant company on construction account.

The agreement was made in 1887. The effect of its terms is that the defendant company should in its own right operate the road, furnishing rolling stock and charging for the use of the same, and the two and a half per cent. of its own expenses as operating expenses. There is certainly nothing in its terms or effect that would relieve the defendant from liability as the actual operator of the road, and the fact that the memorandum agreement may not have been formally executed by the defendant or any of its officers, does not do away with the potential fact that the defendant was in possession of the road and actually operating it, as was understood by its officers, on those terms. If not on those terms, on what terms, beneficial to the defendant, or relieving him from responsibility, can it be said the road was operated?

The judge charged at the request of the plaintiff:

That a party in possession of and operating a railroad, whether a lessee or otherwise, is primarily liable for all injuries and default; and that even if the train or engine inflicted the injury is hired to another company, if the company owning the train employs the engineer, and said train is under the control of the engineers and officers of the company hiring it, said company is liable in damages for any injury inflicted; and that the owner of the engine inflicting the injury is liable to the person injured, if said engine is operated by an engineer in the employ and under the control of said owner.

That a company controlling and operating a railroad and employing all the agents, servants, engineers, conductors, and other employees, and having complete control over them, and doing business in its own name, whether said company operates and controls as lessee or otherwise, such company may be regarded as the owner *pro hac vice* of the road it controls and operates.

Each of these charges were excepted to by the defendant, who requested the following charge: If the jury believe from the evidence that the fire which destroyed the property of the plaintiff on the 9th of April, 1888, in the town of Tavares, originated from sparks emitted from an engine which left Tavares on the morning of the fire, ran over the track of the Sanford & Lake Eustis Railroad Company, and that the

agents operating said engine were paid by the Sanford & Lake Eustis Railroad Company, and were solely under the control of the Sanford & Lake Eustis Railroad Company, then the Jacksonville, Tampa & Key West Railway Company, the defendant corporation, is not responsible for the act of said agents and servants, although they may believe said agents and servants were guilty of negligence in operating said engine. This charge was refused, and the refusal excepted to.

We do not see that the judge erred either in instructing the jury as he did, or in refusing to charge as he was requested by the defendant. If one railroad company operates a railroad under a lease from another, it is responsible for its negligence to persons injured thereby, and the invalidity in law of the lease is no defence to the lessee company against liability to persons suffering by its negligence. If its possession or operation of the road is, in law, unauthorized, it is no less the author of the injuries its want of care may proximately inflict upon them, and it cannot use one wrong as an excuse for or bar to liability for another which it could not have inflicted but for the first. 3 Wood's Railway Law, sec. 489, 490; Rorer on Railroads, 606; Sprague vs. Smith, 29 Vt., 421; McCluer vs. Manchester & Lawrence R. R., 13 Gray, 124; Wasmer vs. Delaware, L. & W. R. R. Co., 80 N. Y., 212; Clany vs. Iowa Midland Ry. Co., 37 Iowa, 344; Pitts-

JANUARY TERM, 1891.    73

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

burgh, C. & St. L. R. R. Co. vs. Campbell, 86 Ill., 443; Doolan vs. Directors of Midland R. R. Co., Law Reports, 2 App. Cases, 792. In Sprague vs. Smith, 29 Vt., 421, where trustees of mortgage bonds had taken possession of a railroad on account of default in payment of interest, and at the request of the company, and a question was whether the defendants were personally liable upon contracts made by the operators upon the road or for their negligence or misconduct, while the defendants continued to operate the road and to receive freight and pay for passengers for the benefit of the *cestuis que trust*, Judge Redfield, speaking for the court, and after remarking that lessees are liable to the same extent as the lessors would be, says: Indeed, there can be no question we think, that a mere intruder into the franchises of a railway corporation who should continue to use it for his own benefit, would be liable to passengers and the owners of freight who should employ him, to the same extent precisely as the company itself, wh'le continuing the same business. Any other view of the liability of such intruder would be to allow him to allege his wrong in his defence; and we can see no reason why the defendants are not liable to the same extent as the company would have been, and upon similar grounds to those upon which lessees, or any others exercising the franchises of the company for the time must be; that is, they are the ostensible parties who appear to

the public to be exercising the franchises of the company. It would be perplexing in the extreme to require strangers, suffering injury through the negligence of operatives under the defendant's control to look beyond the party exercising such control. The party having this independent control is generally liable for the acts of those under such control, whether of contract or tort. In Hall vs. Brown, 54 N. H., 495, the defendants, owners of a private railroad, were, with the consent of a railroad corporation, accustomed to run their cars and engines over a part of the track of the corporation, including a highway crossing, and it was held that while thus in occupation of the track they were to be considered proprietors of the railroad of the corporation, under a statute providing that no such "proprietors" should obstruct by their engine, cars or train, any highway, under a certain penalty. See also Tracy vs. Troy & Boston R. Co., 38 N. Y., 433. And in McCluer vs. Manchester & Lawrence R. R. Co., 13 Gray, 124, the decision was, that parol evidence that a railroad corporation established by law in another state has held itself out through its agents as a common carrier over a railroad in Massachusetts, is sufficient *prima facie* evidence of its capacity to contract for such carriage, to maintain an action against it for the loss of merchandise entrusted to it.

The defendant company was in possession and operation of the road and the train was under the control

and management of its officers and agents, and whether
we consider or exclude from our consideration the
memorandum, and whether the possession was rightful
or wrongful, and whether the agreement of lease was
valid or invalid, the company is liable. There is noth-
ing in the autorities or the charge of the court incon-
sistent with this view.

II. There is testimony to the effect that on the
morning of April 9th, 1888, as a train of cars drawn by
a locomotive of the defendant company started from
Tavares, a large quantity of sparks, cinders and coals
were emitted from the smokestack of the engine, and
fell on the ground and side walk in front of buildings
facing on the street or boulevard which intervened be-
tween these buildings and the railroad track, and in
one instance inside of one of the buildings from nearly
opposite to which the train started, setting fire in a
number of places, to saw dust on the street near a pine
wood side-walk which was adjacent to the buildings,
and to trash which had collected under the sidewalk,
and to some paper on a case of goods in the particular
building referred to; and the sidewalk, which was ele-
vated a few inches from the ground, caught fire, and
the fire was communicated under and to one of the
stores, and thence to other buildings, including those
of the plaintiff, whose buildings, constructed of pine
wood, together with its personal property described in
the declaration, were entirely consumed. That a very

76          SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

strong wind, incident in that section of the country to
the season, was blowing at the time in the general di-
rection in which plaintiff's buildings lay from where
the fire was set out.   The fire in the saw dust was sup-
pressed in a number of places, but whatever efforts
were made as to that in the sidewalk were ineffectual,
and the flames spreading with great rapidity, nearly
the entire town was destroyed within, according to the
great preponderance of the testimony, one hour.   It is
testified by one witness that some of the coals were as
large as three-quarters of an inch long, by a quarter of
an inch wide, and by another that they were as large
as the end of his little finger, and by another that they
were the size of his finger nail, and by another, they
were a quarter of an inch long, and they are also de-
scribed as being burning coals when they fell.   There
are other witnesses who do not describe the sparks as
being large, yet testify to seeing them and their set-
ting out the fire, and some witnesses who saw this
much, do not connect the sparks with defendant's en-
gine.   The engine did not leave on time, but there is a
conflict as to the time it was behind, the plaintiff's wit-
nesses putting it at as much as forty minutes, and the
defendant's about fifteen minutes, leaving Tavares
about 7:45 a. m.   Plaintiff's witnesses say that the en-
gine started off with a sudden jerk, and moved at a
very great speed.

The testimony of certain witnesses of the defendant

(the conductor, engineer, firemen, and foreman boiler-maker) without stating what point each or any of them has testified to, is to the effect, that on the morning in question, a "mixed train" came into Tavares, and the freight cars being thrown off, the engine, which was numbered 12, went around the "Y" with the baggage and passenger coach, took water, and returned to the platform, when the engineer oiled up, and on signal from the conductor, the train pulled out on its way to Sanford, going at the speed of about three or four miles an hour until it got beyond the limits of the town, not starting at this speed, however, nor with a jerk, but as ordinarily, the engineer opening his throttle enough to start the train, or probably some two, three or four, of its twenty-five or thirty notches; that the fire was made of lightwood without bark, and was a "fresh" or "green" fire, the fire box being full, filled while the engineer was oiling up to start out, and that such a fire makes a heavy dark smoke, and that with such a fire an engine does not throw sparks; that the engine was an extension front engine, and in first class repair at the time; and that the spark arrester was a Cook arrester, a very good arrester, and as good as any in general use in extension front engines, and in perfect order, and all the appliances of the engine were in good repair when the engine left the shops of the company about the last of March preceding the fire, having been put in that condition then; that the

dampers were closed, and the spark arrester was in proper position; and that it would not be possible to move a spark arrester while the engine was hot; that the slide, or door, of the spark arrester, which slide or door is about eight or ten by fourteen inches in size, was closed at the time the train started from, as it was on its arrival that morning at Tavares, and that this was indicated or shown by the handle to the rod of the door or slide, which handle is in full view of the engineer and fireman, was almost perpendicular downward, and had a pin on a chain to hold it in position, which pin was in its hole or proper place; that to open the door the handle had to be thrown up, the door working on an axis; that the spark arrester was examined the next afternoon and found to be in position and sound condition, there being no holes in the netting, and did not look like it had been tampered with; that the construction of the door or slide was such as to have a tendency to keep it closed, independent of the pin on the outside for that purpose; that the handle weighed four pounds, and that it would require a pretty good jerk sometimes, and especially when the engine was hot, to open the slide; that he does not see how there could be any movement of the door, even if the pin should be out, during the running of the engine. To cause it to oscillate would take a pretty good jerk of the engine; that it might do so if the engine should leave the track, but, not otherwise; that

JANUARY TERM, 1891.          79

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

part of the netting of the spark arrester had meshes
an eighth of an inch square, and the other part was for
smaller meshes. The engineer states that if coal or
cinders three-quarters of an inch long should come
from an extension front engine, that it would indicate
that the spark arrester was in bad order, and that the
emission of such sparks would probably occur if the
engine was working hard; that if the spark arrester
was closed and the netting in perfect condition it
would not have been possible for sparks of the size of a
finger nail—three-quarters of an inch long—to have
escaped from the engine. The foreman boiler maker
says that if the netting was in good order, &c., the
sparks of the large size indicated could not have
passed through the netting. The conductor says he
did not notice any sparks from the engine; that he
was standing in the door of the baggage car, with Maj.
St. Clair Abrams, looking toward the town.

It is insisted by defendant that the burden of prov-
ing negligence, which burden is on the plaintiff, is not
met by showing the mere fact of the setting out of
fires by sparks emitted from the defendant's engine,
but that he must go further and prove that the sparks
were emitted negligently, which negligent emission, it
is admitted may be proved by circumstances of a char-
acter to raise a presumption of negligence, which pre-
sumption, however, may be successfully rebutted; and
defendant insists, that even if plaintiff's testimony is

sufficient to raise such a presumption of negligence by defendant, it has been successfully rebutted by the latter in proving due care on its part in handling the engine, and that the engine was fitted with proper appliances for arresting sparks, and that they were in proper order and condition. .

The trial judge refused the plaintiff's request of a charge containing the proposition that if the jury were satisfied from the evidence that sparks came from the locomotive and caused the fire, which, spreading, destroyed plaintiff's property, the burden of proof rests on the defendant to show that he was not negligent; but, on the contrary, he instructed them in accordance with the view requiring the plaintiff to prove that the fire was set out by the defendant negligently or through some default of duty or proper care on its part. Wharton on Negligence, sec. 870; Shearman & Redfield on Negligence, sec. 57-60; Pierce on Railroads, 437, 438; 1 Redfield on Railroads, 476; 2 Rorer on Railroads, 796; Savannah, Florida & Western Ry. Co. vs. Geiger, 21 Fla., 669; Jennings vs. Pennsylvania R. R. Co., 93 Penn. St., 337; F. & B. Turnpike Co. vs. P. & T. R. Co., 54 Ibid, 345. That negligence may be proved circumstanially, there can be no doubt either in reason or upon authority. A. T. & S. F. R. R. Co. vs. Bales, 16 Kansas, 252; Philadelphia & Reading R. R. Co. vs. Schultz, 93 Penn. St., 344. The fact that no instrument has yet been found which entirely

prevents the escape of sparks from locomotives, seems, when coupled with the fact that the use of these engines is both lawful and eminently useful, a sound reason for the view that the mere emission of sparks, or the simple setting out of fires thereby, is not *per se* evidence of negligence, and will not throw upon the defendant the burden of removing such presumption, but when the circumstances of the emission are such as common experience, or the known efficiency of approved spark arresters in general use, tells us would not exist if such instruments are properly used, such circumstances, of themselves, suggest negligence. Shearman & Redfield, sec. 59, 60; Wharton, sec. 871; Wood on Railroads, 1348-9; Garrett vs. C. & N. W. R. Co., 36 Iowa, 121; Pennsylvania & Reading R. R. Co. vs. Schultz, *supra*. Where the sparks are unusual in size, or both of unusual size and in unusual quantity, the inference of negligence arises. Ibid; Jackson vs. C. & N. W. R. Co., 31 Iowa, 176. In Hall vs. Sacramento Valley R. Co., 14 Cal., 387, the fact that fire was communicated to plaintiff's grain from defendant's engine, with proof that this result was not probable from the ordinary working of the engine, was held sufficient *prima facie* proof of negligence to carry the case to the jury. Henry vs. S. P. R. Co., 50 Cal., 176; Ellis vs. P. & R. R. Co., 2 Irredell, 140; Herring vs. Wilmington & Raleigh R. R. Co., 10 Ibid, 402. In Huyett vs. Philadelphia & Reading R. R. Co., 23

Penn. St., 373, it was shown that the weather was very dry and windy, the wind blowing strong across the road towards plaintiff's house, which was seventy-seven feet from the railroad track; sparks were seen flying from the engine to the distance of more than fifty yards, and farms and fields were set on fire about the same time and at considerable distance from the road; the defendant's evidence showing that the engines were in good order, and all provided with good spark catchers; that they flew most when the door was open, and the fire stirred, and considerably in firing up. The lower court directed a verdict for defendant, but was reversed on appeal, where it was held that the question of defendant's negligence was one for the jury to decide. Gagg vs. Vetter, 41 Ind., 228; Pennsylvania R. R. Co. vs. Hope, 80 Penn. St., 373.

The testimony in behalf of the plaintiff shows an extraordinary escape of sparks of sparks, both in quantity and size. The witnesses who testify to this are numerous, and the terms in which they describe them cannot fail to impress anyone, if the facts were as represented by them, that the emission of sparks was in all respects far in excess of anything likely to occur in the ordinary operation of a locomotive duly supplied with modern appliances approved by the test of use, and properly managed by competent operatives. This testimony was of itself, to say no more now, sufficient to raise a presumption of negligence upon the part

JANUARY TERM, 1891.    83

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

of the defendant, and throw the burden of proof of care
upon it.    The railroad company does not present any
affirmative testimony that sparks were not emitted as
asserted by the witnesses of plaintiff, but its main re-
liance on this point is on the evidence that the engine
was in good condition, supplied with proper applian-
ces, and properly managed.    In considering this point
we shall assume that the testimony of defendant's
witnesses is to the effect that the engine was perfect in
all its parts and appliances, and its management un-
equalled, yet after doing this the law governing the
case will not permit us to disturb the finding of the
jury, in so far as it imputes negligence to the defen-
dant.

In Brushberg vs. Milwaukee L. S. & W. R. Co., 55
Wis., 106, the issue was whether the fire which de-
stroyed plaintiff's barn was caused by the negligence
of the railway company; the defendant's evidence was
that the engine was perfect in all respects, and supplied
with all suitable appliances for preventing the escape
of sparks, and run in a careful manner, and that the
spark-arrester and fire box were both closed so that no
dangerous sparks or fire could escape; and the testi-
mony of the plaintiff was not only that the barn was
found on fire after the engine passed, but that when
passing it the engine was emitting sparks in great num-
bers and coals an inch or more long; that some of these
struck the barn and some went under it; that coals of
a similar size were seen immediately after on the track
and beside the track in the immediate vicinity of the

barn, and that several stumps, a short distance from the barn, and near the track, were also found on fire soon after ; and the officers of the company testified that if the engine had been properly run and cared for no coals of the size described could have escaped. The jury found for the plaintiff and the judgment was affirmed on an appeal taken by the railroad company. Alluding to the testimony in behalf of the plaintiff as to the large coals and cinders, and their being carried by the wind to and under the barn, and that the barn was on fire a few minutes after the train had passed, it is said in the opinion : that there certainly was evidence to go to the jury, not only as to whether the fire was communicated to the barn, but also whether the engine was properly managed and run at the time, though it be admitted that the evidence on the part of the company was conclusive that the engine was properly constructed and furnished with the most approved appliances for preventing the escape of sparks, coals and cinders ; that if the engine was properly constructed and handled it would not and could not have emitted coals and cinders of the size indicated, and therefore it became a question of veracity between plaintiff's witnesses and those of defendant, and this question was one which had to be determined by the jury, and which the court could not determine. Referring to the cases of Spaulding vs. Chicago & Northwestern Railway Co., 33 Wis., 582, and Read vs. Morse, 34 Ibid, 315, (the former of which is relied on by the appellant before us,) it is further said : Had the plaintiff's proofs gone

no further than to show that sparks escaped from the
engine and were carried by the wind as indicated, with-
out showing the escape of coals and cinders of an un-
usual size, the proof offered by the defendant might
have been sufficient to rebut the presumption of negli-
gence on the part of the employees arising from the
fact that such sparks ignited the barn, and put the case
within the rulings of the two cases referred to.   In
A. T. & S. R. Co. vs. Bales, 16 Kansas, 252, the de-
fendant's proof was that the engine was of the first-
class, in good order and condition and operated by a
careful and skillful engineer to the best of his knowl-
edge and ability, and the plaintiff proved that the same
engine on the day of the alleged fire caused a large
number of fires, a dozen or more, but that other en-
gines operated over the same track on the same day
and before and since did not produce any such results.
Now, says the opinion, it would seem to us that such
evidence would lead irresistibly to the conclusion that
there was negligence somewhere.   Of course it would
not locate the negligence, or show whether the fault
was with the engine or the engineer.   *   *   Now when
the jury found that the engine was good and in proper
condition, then they had to weigh the foregoing cir-
cumstantial evidence with the direct testimony of the
engineer who testified that he managed the engine
skillfully and carefully.   If they believed from all the
circumstances of the case that the testimony of the en-
gineer was wholly unworthy of belief, they had the
undoubted right to so find and entirely disregard it,

and to say that the circumstantial evidence of the plain-
tiff tending to prove negligence, immeasurably out-
weighed the direct and positive testimony of the de-
fendant declaring there was no negligence.   The court
could not weigh the evidence.   In P. & R. R. Co. vs.
Schultz, 93 Penn. St., 341, there was testimony that
the engine was furnished with an approved spark-
arrester, and was examined on the day of the fire,
when it was found to be in good condition, and that it
so continued for months afterwards.   Unfortunately
for the defendant, says the court, the plaintiff furn-
ishes abundant proof that the engine in question either
was not furnished with the necessary spark-arresting
appliances, or if so, they had been tampered with by
the persons in charge of the same.   On any other the-
ory it is unaccountable that this locomotive alone, of
all run on the road, should have fired the country
through which it passed almost daily for the period of
two weeks, and that it should have become so noto-
rious in this respect that, as one of the witnesses says:
"We watched for that train every day so that we
might be ready to put out fires."   Moreover two of
plaintiff's witnesses say that this engine threw out
sparks as large as a hickory nut, and there is the fur-
ther significant testimony that shortly after the Schultz
fire this locomotive ceased to be dangerous, or as one
of the witnesses said:  "After this we had a rest."
See also St. L. A. & T. R. Co. vs. Gilham, 39 Ill., 455;
Webb vs. R. W. & O. R. R. Co., 49 N. Y., 420; P. &
R. R. Co. vs. Hendrickson, 80 Penn. St., 182; Ill.

Cen. R. Co. vs. McClelland, 42 Ill., 355; 23 Penn. St., 373.

The application of these authorities to the testimony of the case before us is patent. An inspection of the piece of the netting in evidence, with meshes one-eighth of an inch square is, to say nothing of the testimony of the engineer and foreman boiler maker enough to satisfy anyone that the larger coals could not have passed through the arrester if the door had been kept closed, or the arrester in proper condition. This impossibility rendered the testimony of the plaintiff's witnesses and that in behalf of the defendant on the subject of the engine's having a spark arrester, or admitting that it had one, of its proper management, and hence on the issue of negligence *vel non*, absolutely irreconcilable, and it made a question of credibility of witnesses, the decision of which the law remitted to the jury, who have settled it in favor of the plaintiff; and under the jurisprudence governing us, this court cannot interfere, whatever may be its view as to the correctness of their judgment. There is nothing in any case cited by the appellant that is inconsistent with these conclusions.

It is urged under this head, that certain charges given to the jury were erroneous. These are the 3rd, 14th, 19th, 20th, 22nd and 23rd. The objection urged against the 20th charge is, it affirms that the defendants were required to exercise the "utmost care," under the circumstances indicated in the charge. The authorities relied upon in support of the objection are,

Wharton on Negligence, sec. 869; Frankford and
Bristol Turnpike Co. vs. Philadelphia & Trenton R. R.
Co., 54 Penn. St., 345; Michigan Central R. R. Co. vs.
Anderson, 20 Mich., 244; Kansas Pacific R. R. Co. vs.
Butts, 7 Kansas, 308. The first of these authorities,
as far as applicable, calls for "the diligence good spe-
cialists in this department are accustomed to exercise,"
and for the exercise of "every precaution * * * to
prevent injury." In the Pennsylvania case the plain-
tiff's bridge had been constructed long before the rail-
roads, and was destroyed by fire set out by the locomo-
tive of a passing train. The track was about one hun-
dred and fifty feet from one end of the bridge, and
three hundred feet from the other, and the nearest de-
pot stood about four hundred yards from the bridge.
The plaintiff's contention was, in so far as the case
need be noticed now, that the station should not have
been placed so near the bridge, and that the bridge
should not have been passed by the locomotive under
steam. It was shown by the testimony that an engine
under ordinary headway would run six hundred feet
with the steam shut off, but that stopping at the station
required that steam be put on to run over defendant's
bridge over the same creek that plaintiff's bridge
spanned. There was no evidence as to any unusual
emission of sparks either in quantity or size. The doc-
trine of the case, announced as abundantly supported
by authorities adduced on both sides, is, that there be-
ing in the charter of the company no prescribed limit
of approach towards buildings and bridges, it could

locate its road and station on such route and at such points as in the judgment of the directors would be beneficial to the interest of the corporation and the public; that in the absence of proof of a special motive to do injury, we must presume that the location was made for proper ends, and not to do injury; that the proximity of the station and of the line of the road to the plaintiff's bridge could not in itself be considered a ground of legal liability, but an element only in ascertaining the degree of reasonable care to be used under the circumstances; that the law in conferring the right to use an element of danger protects the person using it except for an abuse of his privilege, and that in proportion to the danger to others will arise the degree of care and caution to be used in exercising the privilege; that great danger demands higher vigilance, and more efficient means to secure safety; where the peril is small less will suffice; that it is undoubtedly the duty of a railroad company using such dangerous machines fired by intense heat and running in close proximity to our houses and valuable buildings to use the utmost vigilance and foresight to avoid injury; that it is the duty of those using these hazardous agencies to control them carefully, and adopt every known safeguard, and to avail themselves from time to time of every approved invention to lessen their danger to others; that questions of skill, vigilance, care and proper management in any business, are necessarily questions of fact, depending upon the circumstances of each case, and are to be referred to a jury; what is care in one case may

be negligence in another, where the danger is greater
and more care is required ; that as the degree of care
has no legal standard, but is measured by the facts
that arise, it is reasonable that such care must be re-
quired as it is shown is ordinarily sufficient under sim-
ilar circumstances to avoid the danger and secure the
safety needed ; and therefore that ordinary care is the
only rule that can be stated by a court; and that which
is ordinary care in a case of extraordinary danger, would
be extraordinary care in a case of ordinary danger; and
that which would be ordinary care in a case of ordinary
danger, would be less than ordinary care in a case of
extraordinary danger.   Holding these views, the court
said it could not controvert the proposition of the Turn-
pike Company that it is the duty of railroad companies
to adopt the best precautions against danger in use,
and it is not sufficient for them to exercise what, under
circumstances of less risk, would be ordinary care.   It
was held, however, that the trial judge had not violated
these principles in his charges.   The conclusion of the
court upon the point was, that to hold it improper to
stop at the station, and that steam must be shut off in
passing by the bridge, would be to abridge the proper
and ordinary use of the road ; that the injury in the
case did not arise from any special act of negligence,
but from a customary and lawful use of the road ; that
such use would, however, not justify stopping to blow
off steam through the mud valves at a common crossing
where many horses pass or are frightened by the noise,
or stopping in a high wind opposite a new house in the

process of building, where the burning cinders and sparks are carried through the open doors by the wind; that negligence has been defined to be the absence of care according to the circumstances, but that it had never been held that steam must be shut off in passing even in close proximity to dwellings, though many miles of railroad run within a few feet of valuable houses, mills and manufactories, and indeed through towns and cities.

The Michigan case is one in which the plaintiff's building was destroyed by fire communicated by sparks flying from defendant's engine. The lower court, says the opinion, charged the jury that regard must be had to the actual state of things at the time, the force and direction of the wind, dryness of the weather and proximity of the building to the railroad, and that what might be ordinary care on a still and wet day, might not be on a windy and dry one, and when near combustible matter; the question still being what care a prudent man would exercise in precisely similar circumstances. There had been full testimony upon the character of the engines and stacks, and the use of the proper means to render them as secure as possible from doing mischief by the discharge of sparks, and this charge was independent of any question as to the quality and character of the equipments as suitable to be used. This rule was held to be incorrect, the Supreme Court saying: that railroad trains cannot deviate from their track, and must make schedule time, not only for purposes of business, but

92  SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

for consideration for human life, and that those who establish themselves in the neighborhood of railroads must know that trains are expected to run with regularity, and if there are special risks arising from no want of care in the proper equipment and management of engines and trains, those risks are not chargable to the railroad, but are incidental to the situation, and the extra care they demand devolves upon the other party, and the consequence of his not exercising it must fall upon him, because the railroad is not in fault. The Kansas decision merely decides that where the fire escapes owing to high winds, and no negligence or want of care upon the part of the railroad company, the latter is not responsible.

There is nothing in any of these authorities that requires us to hold the use of the word utmost to be fatal to the charge. The Pennsylvania court uses the same expression asserted here as being objectionable in the charge. Nothing need be said of the section in Wharton's work, nor of the Kansas case, and we think that the meaning of the Michigan decision is the same as that in Kansas, which is, that where there is no negligence upon the part of the railroad, it is not liable for damages attributable solely to the wind, damage which the exercise of proper care was unable to avoid. In neither of them was the *locus* of the injury in a village or town.

In Fero. vs. Buffalo & State Line R. R. Co., 22 N. Y., 209, the charge was, that less care is required of railroad companies while running their trains in the

country where there is no property near their track exposed to fire, than in a village where wooden buildings are situated so near their road as to be exposed to fire from the locomotive, and at a time when the wind is blowing in a direction from the engine towards the buildings, and that under such circumstances they are bound to use the utmost care, and if from the want of such care fire is communicated to such buildings and they are consumed, the company will be liable, in the absence of contributory negligence upon the part of the owners, and the ruling was affirmed by the Court of Appeals, it observing that a much higher degree of care, both in respect to the rate of speed, and the watchfulness to prevent casualties, should manifestly be required when trains are passing through or remaining stationery in the streets of a city or densely populated village, and that it was not stretching the rule unduly to say that under such circumstances the railroad company is bound to use the utmost care to guard against the damages which obviously attend such a condition. "The substance of the charge, without criticising its terms with too great nicety, is that the care must be proportioned to the danger of accidents, and that where there is great danger there must be a corresponding degree of care." See also Longabaugh vs. V. C. & T. R. R., 9 Nevada, 270, 299, and G. T. R. R, Co. vs. Richardson, 91 U. S., 454, 469, 470.

In view of the New York and Pennsylvania cases we do not say, and do not think there was error in the

94                    SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

use of the word "utmost," in the 20th charge, and
there is nothing in the authorities cited by appellant,
or in any falling under our notice, that is inconsistent
with this conclusion. Moreover this charge distinctly
affirms that the degree of care required is to be pro-
portioned to the danger to be apprehended of inflict-
ing injury to the person or property of others, by
which we understand the judge announced the same
doctrine as is announced in the opinions in the two
cases referred to, which in other words, is that the de-
gree of care is to be measured by or according to the
facts that arise, or in proportion to the danger, and
with which rule the use of the word utmost as defining
the care required in a case where circumstances are
like those existing in the one at bar, is not inconsis-
tent. We fail now to conceive a case, likely to occur
in the natural course of things, that would call for a
higher degree of care against damage by fire than the
circumstances of the one before us called for.

In one of these charges it is said that the engine
must have the "most approved appliances," to prevent
the escape of sparks, and another that a railroad com-
pany should provide engines with "modern appli-
ances," in another, the 23d, the view announced is,
that the engine must have been supplied with "a
spark-arrester of the best mechanical invention and
construction in general use at the time." These
charges were all given at the request of the plaintiff.
Instructions given at the request of the defendant are,
in so far as they relate to the character of the appli-

ances, as follows :  That it is not negligence to run an engine which emits sparks, provided the company use machinery equipped with such spark-arresters and mechanical contrivances as are the best generally known and in use in the country for the prevention of the escape of sparks, and that are approved by experienced railroad operators.''   That the company is only required '' to avail itself of the best mechanical contrivances which had been tested and put in general use at the time of the fire, for preventing the burning of the property of others, but it is not required to use every possible contrivance, although patented and recommended in scientific discussions ;'' and that the engine shall be supplied '' with a spark-arrester of the best mechanical invention and construction in general use at the time, or, as in still another, or fourth charge on the subject, one ''of the most approved style in general use.''

The language of the twenty-third charge is excepted to as too stringent.   Of the six authorities cited by counsel for appellant, on this point, we have access to Wharton's Negligence, sec. 872 ;  Frankford & Bristol T. Co. vs. P. & T. R. Co., 54 Penn. St., 345 ; Steinwig vs. Erie Ry. Co., 43 N. Y., 123 ;  Jefferies vs. P. W. & B. R. Co.,  3 Houston, 447.   These authorities, taking them in their order, hold, the first, that a company cannot be required to use the ''most perfect possible contrivance to prevent the escape of sparks,'' and until the contrivance ''has been accepted in general use a company cannot be charged with negligence in not

96 SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

adopting it;" the second, that it is the duty of the company "to avail themselves from time to time of every approved invention to lessen" the danger; the third, that it should use any improvements known to practical men, and which has actually been put into practical use, but a failure to take every possible precaution which the highest scientific skill might suggest, or to adopt an untried machine, or mode of construction, is not of itself negligence; and the fourth, that engines should be supplied "with such spark-catchers as were then in general use."

The charge excepted to considered alone, or in connection with the others, does not violate these authorities. The several instructions set forth the law correctly and in accordance with the current of authority.

III. The defence of contributory negligence, is asserted in the fifth plea, and it is attempted to maintain it by evidence which tends to show that there was an accumulation of trash in the streets and under the sidewalk, where the fire was set out, and under the store or building of Lester, to which it communicated, and from which it spread to other buildings, including those of the plaintiff. There is nothing in the record that connects the plaintiff in ownership or control of the street or sidewalk where the fire was set out, or of the Lester premises, or in responsibility of any kind for their condition; yet it is contended that as the owner or keeper of the Lester premises, and the authorities of the town of Tavares, were negligent, and thereby they contributed to whatever injury they respectively may

have sustained, and could not recover damages of the defendant, the platntiff cannot be in a better position than they would be. Assuming, for argument's sake, that Lester and the town authorities were culpably negligent, and that such negligence was contributory to any injury they may have sustained by the fire, that neither of them could recover for it, and that but for their negligence the fire would not have communicated to plaintiff's property, there is yet no benefit to be found for the defendant in such an assumption. Lester and the town authorities are entire strangers to the plaintiff and the fault of a mere stranger, however much it may contribute to the injury, is no defence for one whose negligence is the proximate cause of the injury. The fact that both the defendant and the stranger may be liable to the plainiiff is not a defence for either. Cooley on Torts, 684; Shearman & Redfield, secs. 61, 65, 66; Small vs. C. R. I. & P. R. Co., 55 Iowa, 582; North P. R. Co. vs. Mahoney, 57 Penn. St., 187; Eaton vs. Boston & L. R. Co., 11 Allen, 500; Lane vs. Atlantic Works, 107 Mass., 104; Martin vs. North Star Iron Works, 31 Minn., 407; Hunt vs. Missouri R. R. Co., 14 Mo. App., 160; Atkinson vs. Goodrich Transportation Co., 60 Wis., 141; Paulmier vs. Erie R. R. Co., 34 N. J., (Law) 151; Lake vs. Milliken, 62 Me., 240; Sullivan vs. Philadelphia & Reading R. R. Co., 30 Penn. St., 234; Sheridan vs. Brooklyn City & Newtown R. R. Co., 36 N. Y., 39; Webster vs. Hudson River R. R. Co., 38 N. Y., 260; Arctic Fire Ins. Co. vs. Austin, 69 N. Y., 470.

The charges of the judge to the jury on this point are complained of as excluding entirely from the latter the consideration of the evidence showing the condition of the streets and sidewalk; that it was a question for the jury to say whether this condition of the streets constituted contributory negligence, but the court determined this question itself by deciding that no act or omission of that kind constituted contributory negligence. The charges being on this particular point, to which appellant has objected, are the 6th, given at plaintiff's request, and the 4th, given by the judge of his own motion.

These charges are as follows:

6th. That the plaintiff is not charged with the duty of keeping the streets or the sidewalks of the town in good condition or free from trash; that the fact that there was trash in the streets or under the sidewalks, or that the sidewalks were made of inflammable material, does not constitute contributory negligence so as to prevent plaintiff from recovering; that contributory negligence to prevent recovery must be some omission of duty which the plaintiff was compelled to perform, or some act by him concurring in the destruction of his property; that the owner of property is not compelled to keep his property in such a condition as to guard against the negligence of a railroad company.

4th. The contributory negligence of the plaintiff, in order to defeat a recovery, must be such as contributed as a proximate cause to the occurrence from which the madage arose, and it must be the negligence of the

plaintiff, his agents, servants or employees, and not that of third persons, and the burden is on the defendant to prove it, unless disclosed by plaintiff's testimony.

15th. That to charge the plaintiff with contributory negligence, defendant must show by affirmative testimony that the plaintiff did something, or failed to do something, which it was the duty of the plaintiff to do, or not to do, that concurring in causing the fire or the spread of the fire to plaintiff's property, and which tended to produce the destruction thereof, and that the burden of proof is on the defendant to show such contributory negligence.

These charges considered as bearing upon the negligence of the town authorities and Lester, are, in the light of the testimony, which fails entirely to show any privity or responsibility of plaintiff with or on account of either of them, entirely in consonance with the law as we find it written in the books. Had the judge submitted to the judgment of the jury the question as to whether the contributory negligence of a stranger is a defence to plaintiff's action against a negligent defendant, he would have grievously renounced, for the time, his own proper function of instructing the jury as to the law of the case, and made them, instead of the court, judges of the law.

There is nothing in the authorities cited by appellant (Pierce on Railroads, 434; Coats vs. Missouri, Kansas & Texas Ry. Co., 61 Mo., 38; Ohio & Mississippi R. R. Co. vs. Shanefelt, 47 Ill., 497; Chicago

& Northwestern Ry. Co. vs. Simonson, 54 Ill., 504; Murphy vs. Chicago & Northwestern Ry. Co., 45 Wis., 222; Kessee vs. Chicago & N. W. R. R. Co., 30 Iowa, 78; Kansas Pacific Ry. Co. vs. Brady, 17 Kansas, 380;) that in any way conflicts, on this point, with those we have given above. Counsel have overlooked the distinction made by the law between the negligence of the plaintiff, and that of a stranger to him.

That the plaintiff was not bound to keep guard against the negligence of the defendant, but has the right to enjoy his property in the ordinary manner, and that while he is charged with the duty of saving his property from destruction, if it can be saved, he is under no obligation to stand guard over it continuously watching it to protect it from the *negligence* of the defendant, is a proposition of law too clearly correct to admit of any controversy, and nothing in the authorities cited by appellant question it, and the same is true of the charge that the fact that the plaintiff's property was exposed to the reach of sparks of a locomotive engine is no defense to an action of this kind, and the plaintiff has the right to construct his buildings on any part of his property, and to enjoy the same without rendering himself liable to the *negligence* of the defendant.

There was no error in the fifteenth charge. L. & N. R. R. Co. vs. Yniestra, 21 Fla., 700. Neither the plaintiff's, nor the defendant's evidence shows any contributory negligence.

IV. The appellant also assigns as error the refusal

of the judge to give the following charges requested
by it: "That if the jury believe from the evidence
that at the time of the fire, plaintiff's property, or any
part ot it, was in the possession of a lessee or tenant
of the plaintiff, and that by the exercise of the ordi-
nary prudence and care under the circumstances then
existing, the said lessee or tenant might have saved or
preserved from destruction the property of the plain-
tiff, or any part of it, then the plaintiff cannot recover
damages for the destruction of the property, or that
part of it which might have been saved, even though
the defendant were guilty of negligence in setting out
the fire which caused the destruction of the plaintiff's
property."

"That if the jury believe from the evidence that at
the time of the fire the property of the plaintiff, or
any part of it, was in the hands of a tenant or a les-
see of the plaintiff, the relation of such tenant or les-
see to the property in such as to require him to take
reasonable care to prevent damage and loss of said
property; and if they believe from the evidence that
the property of the plaintiff, or any part of it, at the
time it was destroyed, was in the possession or control
of said lessee or tenant, and that he failed or neg-
lected to save said property, or any part of it, from
destruction, which he could have done by reasonable
care and diligence, then the plaintiff cannot recover
from the defendant for that part of the property de-
stroyed in consequence of said failure or neglect."

Contributory negligence, as it is defined by the books, must emanate from the plaintiff, or from some person for whose act he is responsible. Shearman & Redfield on Negligence, sec. 61. In the case of Bartlett vs. Boston Gas Light Co., 117 Mass., 533, cited by appellant, it was held that the owner of a house could not maintain an action against a gas light company for an injury to his reversionary interest caused by the negligence of the company in permitting gas to escape into the house, if the *immediate* cause of the injury was the explosion of the gas by the negligence ot the tenant in possession of the house. The tenant having smelt gas during the night, went into the basement with a lighted candle, and the gas ignited from the candle flame and an explosion took place. The explosion would not have occurred but for this reckless or negligent conduct of the tenant, and the conclusion of the court as to the absence of right of the plaintiff to recover was held to rest, not upon the ground of any personal relation of agency between the landlord and his tenant, but upon the relation of the latter to the property as having the present control and charge of it, and therefore being the one upon whom devolved the duty to take reasonable care to prevent damage.

We are not prepared to say that the charges requested would not have been proper if there was testimony in the record to support them. But if they

would be proper under the circumstances stated, we find that the only affirmative testimony directed to the conduct of the lessee of the hotel shows that he did endeavor to save, and actually did save, some of the personal property in the hotel. Not only can it not be said that he was negligent in not saving other personal property than that which was actually saved, but there is not in the record sufficient testimony to have enabled a jury to say that any particular property destroyed could have been saved by him. The testimony should at least go to the extent of identifying the property which might have been saved by the exercise of proper diligence or care, so as to enable the jury to fix the amount of reduction of damages on account of such negligence. St. Louis, I. M. & S. Co. vs. Hecht, 38 Ark., 357; S. C. 9 Am. & Eng. R. R. Cases, 222; Toledo, Peoria & Warsaw Ry. Co. vs. Pindar, 53 Ill., 447; Chicago & Alton R. Co. v. Pennell, 94 Ill., 448; Bartlett vs. Boston Gas Light Co., 117 Mass., 533; 2 Rorer on Railroads, 795; Taylor on Landlord and Tenant, sec. 196. The rejection of the charges, assuming them to announce correct abstract propositions of law, was immaterial to the defendant, considering the testimony before us. Whether there should be a plea setting up the negligence of the lessee, is a question which suggests itself, but is not material to be passed on.

What has been said covers also that part of the fifteenth charge bearing on the same point.

V. Appellant's counsel insist "that the questions propounded to the witnesses A. N. Lester, J. S. Er-

man *et al.*, by plaintiff, as appears from the 8th to the 102d ground, inclusive, of the assignment of errors, were leading, and sought to elicit testimony which was incompetent and irrelevant, and that the court erred in overruling defendant's objection thereto," and they say "these objections are manifest on the face of the questions," and they "submit them without argument. There are one hundred and forty-seven assignments of error, of which a half dozen are expressly abandoned in this court. We have perceived no such infractions of the rules invoked as calls upon an appellate court for interference, and we feel that counsel would have pointed out the same if they had detected them.

The authorities hold that where it is shown, as it is in this case, that the fatal fire has been set out from a designated engine, it is admissible to introduce evidence of other fires previously set out by the same engine, but not by any other engine of the defendant company. Ireland vs. Cincinnati, Wabash & Michigan R. Co., 79 Mich., 163; Coale vs. Hannibal & St. J. R. Co., 60 Mo., 227; Brighthope Ry. Co. vs. Rogers, 76 Va., 443, S. C., 8 Am. & Eng. R. R. Cases, 710; Gibbons vs. Winconsin Valley R. Co., 58 Wis., 335, S. C., 13 Am. & Eng R. R. Cases, 469; Slossen vs. B., C. R. & N. R. Co., 60 Iowa, 215; Lanning vs. Chicago, Burlington & Quincy Ry. Co., 68 Iowa, 502; Baltimore & Susquehanna R. Co. vs. Woodruff, 4 Md.,

242, 253-4.   Former fires by the same engine are admissable as evidence tending to prove its defective condition or construction, or improper management, and those put out by other engines are excluded because they are matters collateral to the issue, and not evidence of the imperfect condition or bad management of the particular locomotive.   It is objected that evidence violative of this principle was introduced against the objection of defendant.   It does not appear that the testimony of Lester was objected to on this ground, or that of York did not relate to the locomotive referred to in the declaration; on the contrary it seems otherwise.   The same is true of that part of the direct testimony of Erman so objected to. On the cross examination he was asked what engine it was he saw throwing sparks "around the opera house," and said he thought it was one numbered 13, which, we may remark, is a different number from that given by the witnesses to the engine which set out the fire on the morning of April 9th, 1888.   There does not appear, however, to have been any motion by defendant to strike out the direct testimony alluded to, and there is consequently nothing to found an assignment of error upon.   Sill vs. Reese, 47 Cal., 394, 341; Baltimore & Ohio R. Co. vs. Shipley, 39 Md., 251.

VI. Upon the questions of *proximate* and intervening cause the court gave the jury the following instructions, (numbered here as in the record), at the re-

106 · SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

quest of plaintiff; 3rd, (paragraph from third charge). "That it is for the jury to decide whether the burning of the plaintiff's property was the direct consequence of fire caused by sparks from defendant's engine; that if the jury believe the fire where it originally started was caused by sparks from the defendant's locomotive, and that said fire spread, whether from the force of the elements or the inflammable character of the buildings, and burned continuously from building to building to plaintiff's buildings and destroyed them; and that the plaintiff either had no power to arrest the flames, or was not present, and consequently could not do anything towards arresting the flames, the jury have the right to conclude that the fire set by the defendant's engine was the proximate cause of the destruction of the plaintiff's property." This charge is assigned as the 105th error.

5th. "That if the jury believe from the evidence that the sparks from the defendant's engine caused the fire and that the spread of the said fire could not have been arrested, or was not occasioned by any new or intervening force, it does not matter whether the buildings belonging to the plaintiff that were destroyed were the first or the tenth. The original fire must be regarded as the proximate cause of the burning of the buildings." This charge is assigned as the 106th error.

(2d instruction given by the court on its own mo-

tion:) "Proximate cause is what leads to, and might be expected directly to produce the injury; that is, such a cause as naturally suggests itself to the mind of a prudent man as likely to cause the accident which produces the damage." This charge is the 132d error assigned.

3d charge by the court: "To entitle plaintiff to recover, the defendant's negligence must be the proximate cause of the accident which produces the damage, without intervening carelessness on the part of the plaintiff, in which event he would become the author of his own misfortune, unless, by ordinary care, he could not have avoided the consequences of defendant's negligence." This charge constitutes the 133d error assigned.

The 15th instruction requested by the defendant on the subject was also given as follows: "The court instructs the jury that the immediate or proximate cause of an injury is that which immediately produces it as its natural consequence."

Upon the same questions the court below refused to give the following instructions, numbered as in the record, requested by the defendant: 16th. "The court further charges the jury that should they believe from the evidence that the negligence of the defendant caused the origin of the fire on the 9th day of April, 1888, in the town of Tavares, yet if they further believe from the evidence that the wrongful act or wilful omis-

sion of duty on the part of third parties intervened and caused the spread of the flames beyond the natural sequence growing out of the first fire, and thereby caused the flames to consume the property of the plaintiff, the defendant is not liable by reason of the intervention of those causes." The refusal of the court to give this instruction is assigned as the 122d error.

17th. "The court further charges the jury that although they may believe from the evidence that the fire originated from sparks emitted from the smoke-stack of defendant's engine, and that too by the negligence of the defendant, yet if they further believe from the evidence that some new intervening force or agency carried the fire from where it was first started, beyond its natural or proximate sequence, to the property of the plaintiff, whereby it was destroyed, defendant is not liable for the destruction of plaintiff's property, and the jury should so find." The refusal of the court to give this charge is assigned as the 123d error.

18th. "The court further instructs the jury, that although they may believe from the evidence that the defendant negligently permitted sparks to escape from the smoke-stack of its engine on the 9th day of April, 1888, in the town of Tavares, whereby fire was communicated to buildings, and the flames from which were communicated to the property of the plaintiff, which were thereby destroyed, yet if they believe from the evidence, that after the beginning of said fire, and

before it reached the property of plaintiff, a fresh wind of additional force arose and carried the flames to the property of the plaintiff, the defendant is not liable for such destruction, unless the jury further believe from the evidence that such flames would have been communicated to the property of the plaintiff as a natural consequence of the said first fire, and without the intervention of the said force.'' The refusal of the court to give this charge is assigned as the 124th error.

14th. '' The court charges the jury that, although they may believe that the defennant was guilty of negligence in setting out fires from its engines in the town of Tavares on the 9th day of April, 1888, it can only be held liable for the immediate, or proximate, and not the remote causes of the injury resulting therefrom.'' The refusal of the court to give which charge is assigned as the 121st error.

After full consideration of the evidence as to whether it furnishes any groundwork for the suppositions premised in these four instructions that were asked and refused to be given, we are unable to see that there was error in such refusal so to give them. And this, for two reasons: 1st, because we fail to discover in the record any modicum of evidence even that would furnish a basis for the premises supposed in the first three of these instructions. As to the sixteenth instruction above, that was asked and refused to be given, the premise upon which the defendant sought

110     SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

therein to construct the defence of intervening cause, is, " that if the jury believe from the evidence that the wrongful act or wilful omission of duty on the part of third parties intervened and caused the spread of the flames beyond the natural sequence growing out of the first fire, and thereby caused the flames to consume the property of the plaintiff, the defendant is not liable," &c., we cannot find in the record even a spark of evidence tending to prove that any act of commission or omission of any third party intervened and caused the spread of the flames beyond the natural sequence of the first fire. So also do we fail to find the evidence in the record upon which to base the premise of the seventeeth instruction asked above and refused to be given. The supposed fact premised therein is: "That some new intervening force or agency carried the fire from where it was first started beyond its natural or proximate sequence to plaintiff's property and destroyed it," &c. There is no evidence in the record out of which this statement of fact could reasonably have been deduced.

And so with the 18th instruction above, asked and refused to be given it is premised upon the assumption of the fact that: "A fresh wind of additional force arose and carried the flames to the property of the plaintiff," &c.; but we fail to see in the record such proof from which this assumption of fact could reasonably have been deduced sufficient to predicate

thereon the askings contained in this 18th instruction refused, even if the coming up of a sudden wind could properly be regarded as such an intervening agency as could not reasonably have been expected. In the argument of the cause it was contended with great ingenuity by the counsel presenting this branch of defence, that there was foundation for this charge in that part of the evidence of the plaintiff's witness, W. S. Blaisdel, wherein he says: "That the smoke was rising up straight, and the wind was sufficient to drive it a little toward the east, the heavier fire." The contention of the argument being that because the smoke rose straight up, it could be inferred therefrom that when the fire first started there was no wind blowing; but this witness in the same sentence says that the wind was sufficient to drive the smoke and the heavier fire a little to the east. And in another part of his testimony this witnesses says: "The wind was to the south-east, and the water was pretty rough—meaning the water of a lake, on the shore of which the town of Tavares is situated. And it was further contended in the argument that there was food for this 18th instruction in the following piece of testimony of the plaintiff's witness, J. H. Sears: "My first notice of the flames was seeing them rush under and between the buildings; then the flames communicated from one building to the adjoining. *The wind seemed to freshen, if anything.*" The fact was lost sight of in

the argument that this same witness in another part
of his evidence stated that before any of the buildings
caught, while he, with another, were trampling out
burning coals of fire near to and along the sidewalk,
"the wind was blowing quite fresh."   We believe it to
be a philosophic truth, capable at any time of practi-
cal demonstration, that every extensive fire so rarifies
the air within the radius of its heat, as to create a
vacuum into which the denser surrounding air rushes
to fill the void so abhorent to nature.   The witness
Sears does not state whether the "seeming" freshen-
ing of the wind, about which he speaks, went to any
greater extent in this instance than was the natural
consequence of so large a conflagration.   We confess
our inability, even in the light of the ingenuity dis-
played in the argument of counsel, to see anything in
these detached parcels of evidence upon which the as-
sumption of fact in these refused instructions can reas-
onably be predicated, particularly when considered in
connection with other parts of the testimony of the
same witnesses from whose evidence they are ex-
cerpted.

It is well settled that instructions of law must be
predicated upon some evidence that has been intro-
duced at the trial ; and that a refusal to give instruc-
tions that are mere abstract propositions, not based on
any color of evidence in the case, affords no ground of
exception.   Randall vs. Parramore & Smith, 1 Fla.,

409 ; Proctor vs. Hart, 5 Fla., 465 ; Judge vs. Moore, 9 Fla., 269.

2d. The other or second reason why we think there was no error in the refusal to give the above four instructions asked by the defendant, is, that we think the substance of the propositions of law contained therein, in so far as they were proper, are fully embraced in and covered by the instructions above quoted that were given by the court. The instructions given embrace the law as fully as was warranted by the evidence in the case. The 14th refused instruction above might properly have been given, as it states the law correctly and contains no assumption of fact not warranted by the evidence, but its proposition of law is fully covered in substance by the instructions that were given ; and there was, therefore, no error in the discard thereof by the court. Nickels & Gautier vs. Mooring, 16 Fla., 76 ; Wooten vs. State, 24 Fla., 335.

The proposition of law desired by the first three of the above discarded instructions to be impressed upon the jury, was, that the defendant company was not liable for the destruction of the plaintiff's property by the fire originated through the defendant's negligence, if, from the evidence, it appeared that some new independent agency intervened, and that such intervening agency caused the destruction of plaintiff's property. While, as before stated, we have been unable to find any evidence upon which to build the theory of "in-

114          SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

tervening cause" in this case, yet we think the 5th, 2d, 3d and 15th charges above, that were given, instructed the jury as fully as was warranted by the evidence, that the defendant was not liable if plaintiff's loss was the result of any new intervening force or agency; and that it was not liable unless the plaintiff's loss was the direct, proximate and natural consequence of its negligence. We have carefully considered the great number of authorities cited by all the counsel in their briefs, besides many others suggested by those cited, and we think that the instructions given upon this feature of the case as above quoted are fully sustained, not only by the numerical strength of the authorities, but by the clearness and force of the reasoning therein, and, to our minds, by the soundness of the principles therein enunciated. There seems to be no fixed rule by which accurately to apply the maxim *causa proxima, non remota, spectatur*, to the circumstances of every individual case; each case necessarily depending, for the applicability of this rule, upon its own peculiar facts. But in Parsons on Contracts, Vol. 3, p. 180 (7th ed.), we find the clearest and most comprehensive explanation of the maxim, and a formula for its application that will furnish a test in almost every case, in the following terse language: "Every defendant shall be held liable for all of those consequences which might have been foreseen and expected as the result of his conduct, but not for those which

he could not have foreseen, and was therefore under no moral obligation to take into his consideration." The same author (Ibid) says, as to the test whether a cause of damage was proximate or remote: "Did the cause alleged produce its effect *without* another cause intervening, or was it made operative *only* through and by means of this intervening cause?"

In Fent vs. T. P. & W. R. W. Co., 59 Ill., 249, a case almost on all fours with the one under consideration, in which a locomotive, passing through a village, threw out great quantities of unusually large cinders, and set on fire a warehouse near the track, from which the plaintiff's building was destroyed 200 feet distant; the weather at the time being very dry, and the wind blowing freely. Chief-Justice Lawrence, rendering one of the ablest opinions upon this subject we have seen, in which many authorities are reviewed, says: "We believe there is no other just or reasonable rule than to determine in every instance whether the loss was one which might reasonably have been anticipated from the careless setting of the fire, under all the circumstances surrounding the careless act at the time of its performance." "If loss has been caused by the act, and it was, under the circumstances, a natural consequence which any reasonable person could have anticipated, then the act is a proximate cause, whether the house burned was the first or the tenth, the latter being so situated that its destruction is a consequence

reasonably to be anticipated from setting the first on fire."

Whether the injury complained of is the proximate result of the defendant's negligent act, or whether the injury was too remote from the original cause and was brought about by some independent intervening force or agency, are questions of fact peculiarly and exclusively within the province of the jury to determine. These propositions, though not in the same propositions, though not in the same forms of expression here used, are substantially embraced in the instructions above that were given; and the soundness of them as propositions of law are fully sustained by the following authorities: Penn. R. R. Co. vs. Hope, 80 Pa. St., 373; A. T. & S. F. R. R. Co. v. Bales, 16 Kansas, 252; A. T. & Santa Fe R. R. Co., vs. Stanford, 12 Kansas, 354; Clemens vs. Hans. & St. Jo. R. R. Co., 53 Mo., 366; Peoppers vs. Mo., Kan. & Tex. Ry. Co., 67 Mo., 715; Perry vs. So. Pac. R. R. Co,, 50 Cal., 518; L. N. A. & Chi. Ry. Co. vs. Krimming, 87 Ind., 351; Doggett vs. Rich. & Dan. R. R. Co., 78 N. C., 305; A. & E. R. R. Co. vs. Gantt, 39 Md., 115; Kuhn & Nebb vs. Jewett, Receiver of Erie Ry. Co., 32 N. J. Eq., 647; Murphy vs. Chi. & N. W. Ry. Co., 45 Wis., 222; Rigby vs. Hewett, 5 Exch., 239; Smith vs. London & So. Wes. Ry. Co., Law reports, 5 C. P. Cases, 98; Kellogg vs. Chi. & N. W. Ry. Co., 26 Wis., 223.

The following clause in the 5th instruction asked

for by the plaintiff and given: "The original fire must be regarded as the proximate cause of the burning of the building," is strenuously urged as error. Had this proposition been given as an independent abstract utterance without any explanation or qualification, we have no doubt of its impropriety in a case like this; but in considering it, reference must be had to that which precedes it in the same charge. When read in connection with the rest of the same charge it is nothing more than the expression of the conclusion to be reached, if the hypothetical proposition put in the preceeding part of the charge should be found in the affirmative. The objectionable clause might just as well, and possibly with more forceful grammatical construction, have been placed at the beginning of the charge, when it would have read as follows: "The original fire must be regarded as the proximate cause of the burning of the buildings if the jury believe from the evidence that the sparks from defendant's engine caused the fire, and that the spread of the said fire could not have been arrested, or was not occasioned by any new or intervening force; it does not matter whether the buildings belonging to the plaintiff that were destroyed were the first or the tenth." By this transposition of sentences without change of verbiage, it at once appears that there was no error in the clause objected to, connected as it was with the preceeding part of the charge.

118 SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

VII. As to the measure of damages the following instructions, numbered here as in the record, were given to the jury: "21st. That the measure of damage in cases of this kind is the value of the property at the time it was destroyed, with interest at the rate of 8 per cent. per annum; that the jury have the right to arrive at this value from the testimony of the witnesses, of the weight and credibility of which they are the sole judges." (117th error assigned.)

8th. (General charge by the court.) "If the jury believe from the evidence that the fire which destroyed plaintiff's property was caused as laid down in the declaration, by the negligence of the defendant as a proximate cause, and that no negligence of the plaintiff concurred as contributing to the result, the plaintiff is entitled to recover from the defendant the value of the property destroyed at the time and place of its destruction, which value you must arrive at from the evidence, with eight per cent. per annum interest added from the 9th of April, 1888, to this time." (138th error assigned.)

Upon the same question the following instructions were asked for by the defence, and refused to be given by the court, numbered here also, as in the record, to-wit: 28th. "The court instructs the jury, that should they find from the evidence that the defendant is liable for the burning of plaintiff's property, in estimating the damages for the property destroyed, they must be

governed by the market value of the property at the time and place it was destroyed." (Its refusal is assigned as the 128th error.)

29th. "That it devolves upon the plaintiff to prove by a preponderance of evidence, the market value of the property destroyed." (Its refusal is assigned as the 129th error.)

30th. "That should the jury find from the evidence, that defendant is liable for the burning of plaintiff's property, in estimating the damages resulting therefrom, they are confined to the market value of the property destroyed at the time and place of its destruction, and they are not to be governed alone by the cost of the property to the plaintiff; but they may take into consideration the age of the property destroyed, its deterioration from use, its situation, the quality of its materials, and all other facts given in evidence which bear on the market value of the property at the time and place it was destroyed." (Its refusal is assigned as the 130th error.)

The law as to what is the "measure of damage" in the abstract, in cases where the property of one has been destroyed, unintentionally, but by the negligence or carelessness of another, where there is no element of wilfulness or maliciousness in the destruction, is well settled to be "just *compensation* in money for the property destroyed;" such an amount as will fully restore the loser to the same property status that he oc-

cupied before the destruction. To arrive at the *amount* of such *compensation*, inquiry, in the absence of malice, is necessarily confined strictly to the ascertainment of the *value* of the properties destroyed, with such incidents of interest for the retention of such value from the person entitled thereto as may be sanctioned by law. The contention of the appellant in urging as error the giving of the above-quoted instructions by the court on this subject, and the refusal to give the above instructions by it asked for, is that the plaintiff in establishing the value of his destroyed properties should have been confined to proof of its *market* value at the time and place of its destruction ; and that the admission of evidence as to the original cost of the properties, and as to the depreciation thereof from its original cost by usage or otherwise, was erroneous ; and that it was error to instruct the jury that the plaintiff was entitled, *as matter of law*, to interest, at the rate fixed by law, upon whatsoever amount of damages they might find the plaintiff to be entitled to.

Wherever there is a well known or fixed market price for any property, the value of which is in controversy, it is proper in establishing the value to prove such market value ; but in order to say of a thing that it has a market value, it is necessary that there shall be a market for such commodity ; that is, a demand therefor, an ability, from such demand, to sell the same when a sale thereof is desired. Where, there-

fore, there is no demand for a thing—no ability to sell
the same—then it cannot be said to have a market
value "at a time when, and at a place where" there
is no market for the same.   We think it would have
been a very harsh rule in a case like this to have con-
fined the plaintiff to proof of the market value of the
property at the time and place of its destruction, in the
absence of proof, that at the time and place of such de-
struction there was a market for such property.   In
cases where property is of a well known kind in general
use, having a recognized standard value, it is not proper
to circumscribe the proof of such value within the lim-
its of the market demand at the time when, and at the
place where, it was destroyed.   Were the rule con-
tended for to prevail, then the compensation for per-
sonal properties confessedly worth thousands of dol-
lars, would be reduced to a pittance in cents if de-
stroyed *in route* from market to market, in a thinly-
settled, barren country where there was no demand,
simply because of the accident of "time and place" of
its destruction.   In actions of this kind where the *value*
of the properties destroyed is the criterion of the
*amount* of damage to be awarded, and the property de-
stroyed has no market value at the place of its destruc-
tion, then all such pertinent facts and circumstances
are admissible in evidence *that tend* to establish its real
and ordinary value at the time of its destruction; such
facts as will furnish the jury, who alone determine the

amoun⁺, with such pertinent data as will enable them reasonably and intelligently to arrive at a fair valuation; and to this end the original market cost of the property; the manner in which it has been used; its general condition and quality; the percentage of its depreciation since its purchase or erection, from use, damage, age, decay, or otherwise, are all elements of price proper to be submitted to the jury to aid them in ascertaining its value. And to establish value in such cases the opinions of witnesses acquainted with the standard value of such properties, are properly admissible. Sullivan vs. Lear, 23 Fla., 463; L. B. & M. R. R. Co. v. Winslow, 66 Ill., 219; 1 Thompson on Trials, sec. 380;. O. & M. R. R. Co. vs. Irwin, 27 Ill., 178; White vs. Herman, 51 Ill., 243; Pennsylvania & N. Y. R. R. Co. vs. Bunnell, 81 Penn. St., 414; Vandine vs. Burpee, 13 Met., 288. Judge Cooley, in Continental Ins. Co. vs. Horton, 28 Mich., 173, in speaking of evidence based on a knowledge of the purchase price of property, says: "The objection that the daughter of the plaintiff was allowed to testify to the value of articles burned, without having been shown to possess the proper knowledge to qualify her to speak as an expert, was not well taken. She testified that she bought a good many of the articles, and was present when others were bought. On this evidence she had some knowledge of values which it was proper she should communicate to the jury. The extent of that knowl-

edge, and its sufficiency as a basis for a verdict, were to be tested by her examination, and by the good sense and judgment of the jurors." Coburn vs. Goodall, 72 Cal., 498; Commonwealth vs. Sturtivant, 117 Mass., 122; Derby & Day vs. Gallup, 5 Minn., 119; The Slavers, (Sarah) 2 Wall., 374; Johnson vs. Warden, 3 Watts, 104; Whipple vs. Walpole, 10 N. H., 130; Joy vs. Hopkins, 5 Denio, 84. In Norman vs. Wells, 17 Wend., 136, the court says: "The ordinary and in general the only legal course is to lay such facts before the jury as have a bearing on the question of damages, and leave them to fix the amount. They are the only proper judges. They are impartial, and capable of entering into these ordinary matters." In Clark vs. Baird, 9 N. Y., 183, Johnson, Judge, delivering the opinion, says: "Upon this ground, as well as upon that of superior convenience and the constant reception of such testimony upon trials without objection, a tacit but strong proof of its propriety, it must be deemed established that, upon a question of value, the opinion of a witness who has seen the thing in question and is acquainted with the value of similar things, is not incompetent to be submitted to the jury. Hamer vs. Hathaway, 33 Cal., 117; Rogers vs. Mechanics Ins. Co., 1 Story, 303; Blydenburg & Burns vs. Welsh, 1 Baldwin (U. S. Ct. Ct.), 331; Whitbeck vs. New York Central R. R. Co., 36 Barb. (N. Y.), 644; Luse vs. Jones, 39 N. J. (Law), (10 Vroom,) 707; Brown & Otto

124 SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

vs. Werner, 40 Md., 15; Allison vs. Chandler, 11 Mich.. 542; F. E. & M. R. R. Co. vs. Marley, 25 Neb., 133; Browne vs. Moore, 32 Mich., 254. We think the evidence as to values admitted in this case were fully confined within the limits of the principles announced, an 1 that there was no error in the admission of such testimony, nor in the giving of the instructions above-quoted upon the question of the measure of damages; nor in the refusal to give the above quoted instruction asked for by the appellant.

It is also contended by appellant that the sole pro of value, excepting the evidence of Randolph as to the rental payable by him, is by or upon the theory of proving cost and then the depreciation, and making this the test of value.

Mr. Alexander St. Clair Abrams, a witness for plaintiff, was permitted, without objection from defendant, to describe minutely the hotel, which was originally built in 1882, and enlarged, in 1886, to a four story building with tower, and the kind and quality of the timber and materials of which it was constructed, furnished, plastered and painted. He says when the building was first put up he was present acting as the superintendent of it almost every day, and then owned a saw mill at Tavares, at which the lumber put into the building was manufactured from the best logs. He also described with fullness the other buildings, and the furniture and other personal property belonging to the plaintiff company involved

JANUARY TERM, 1891.      125.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

in this suit.    He was then asked  what it cost to con-
struct the hotel, and defendant objected on the ground
that it was "not the proper way to prove the true
measure of damages, the true measure being the mar-
ket value of  the property at the time and place of its
destruction;" and the objection was overruled and ex-
ception taken.    At this juncture it was stated to the
court on behalf of plaintiff that this evidence of cost
was not offered as evidence of the value, and that the
plaintiff admitted that the value of the property at the
time of the fire was the true measure of damage, and
that this statement of cost was put in for the purpose
of enabling plaintiff to show by subsequent testimony
what the value was at the time of the fire.    The wit-
ness then testified that the hotel building with tower
and  outbuildings, and its appurtenances cost over
$42,000.    That when the first building was put up the
cost of building material and labor and the freights
were much higher than when the extension was made,
and that he had a personal knowledge of the cost of
lumber, as he was for five years actually engaged in
and was at the time in the saw mill business; and that
when the extension was made the cost of labor and
material was about the same as when the fire took
place; that the condition of the building was perfect;
that in 1886 when the extension was made he had the
original building examined,  helped to examine it, and
found everything in perfect condition ;  that at the
time of the fire the paint was faded; but the walls
were perfect and unmarked, and the ceiling in good

126          SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

condition and the woodwork all as sound apparently as the day it was built; that he had constructed thirty or forty buildings since he had been in Florida, they ranging from a little shanty to a hotel. Here the plaintiff's attorney asked him what he estimated the value of the hotel to have been on the day of the fire, and defendant objected, because it sought to elicit an opinion from the witness, who had not so far properly qualified as an expert, or shown himself legally qualified and competent to give an opinion. The question being withdrawn he stated that he was familiar with the construction of buildings, and that there was no arbitrary rule governing the deterioration of any building, and was thoroughly acquainted with the hotel at the time of its burning, and had been ever since its construction. Here being again asked what the value of the hotel was on the day of the fire, he, after objection, no ground being stated, and exception, by defendant, to the ruling of the court, replied that he estimated the value of the hotel with the outbuildings on the day of the fire at $35,000, stating again that the building on that day was in perfect condition except painting on three sides; the flooring and interior painting, frame and everything being in perfect condition; and that he arrived at his estimate of the value at the time from his personal knowledge of the prices of materials and labor in April, 1888, as compared with prices of labor and material in the previous years in which the building was constructed; that in 1882 when the building was put up, lumber was considerably

higher in price than in 1886 when he enlarged it; rough lumber was "from $15 up," dressed lumber in the same proportion.  In 1886 rough lumber had fallen to $12 delivered in Tavares; in 1888 mill lumber was $10, selected lumber, not all heart, $12; all heart free from knots or windshakes, in 1888, could not have been purchased for less than $15 or $16 a thousand delivered in Tavares; that he spoke particularly of the first building, where he selected and delivered nearly all the lumber put in it, superintending the loading of the wagons and hauling to the building, and thinks he can safely say that there was not one stick of timber put in the first building that had a windshake or a knot in it; all was soft heart pine lumber; that they had probably a million feet to select from in the yard; that the hardware in the building was all purchased by him personally from different parties in New York, Jacksonville and elsewhere, and that he was acting superintendent of the construction of the little building and the enlargement of it.

He also testified, subject to the objection that it was improper and incompetent, that he had the store at the corner of New Hampshire avenue constructed, and was there nearly every day, and his office was on the second floor, and personally made repeated examinations of the building; as he did all his other buildings in Tavares, and it with its annex cost $4,000; several hundred dollars being spent for certain decorations which had been taken away before the fire; and the building, with its annex, he, from his knowledge of

the price of material and labor in April, 1888, estimates at the value of $3,500; that the building east of this one was constructed by witness, the newspaper office was on its second floor, and the paper was owned and published by him for several years, and he was almost daily in the newspaper office and examined the building frequently, and that it cost $2,000, and witness was familiar with its value on the day of the fire, and estimates it at $1,400; that the stable, which he says he constructed and helped to do the carpenter work on, was built in 1885, and cost about $1,500, and he estimates the value of the building, with which he says he was familiar, at about $1,000; that he had the cottage on Ruby street constructed, and it had cost about $600 or $700 at the time of the fire, and he estimated its value then at about $400; that he had a cottage on east Ruby street built, and was frequently in it, and it cost $400 or $500, and he was familiar with its value on the day of the fire, and estimates it at about $200; that he was acquainted with the value of the three remaining cottages, having had them constructed under his supervision; that they cost about $350 each, and he estimates their value, with which he is familiar, at about $200 each.

That in estimating the value of the hotel at the time of the fire he makes allowance for the deterioration of the building ; that the deterioration of a building of that character—a wooden building of yellow pine—depends largely on the quality of timber put into it.   If it is clear heart lumber free from windshakes or knots,

and painted over and protected from the weather, it is very difficult to say when deterioration begins. If it is what is called mill run lumber—that is a whole log taken through with portions of sap in each board—deterioration will begin in two or three years, at times earlier; but clear heart lumber, such as was put into that building, he does not believe there was a deterioration of 5 per cent. in ten years on the building; that the roof of the building was covered in 1886 with new tin and with three coats of paint on the tin; that there could not have been any deterioration in two years; that he made a very large allowance for deterioration in the other buildings, as the material was not so select as that put in the hotel.

He also stated, under objection, that it was "improper, &c.," the cost of the furniture and outfit of the hotel was nearly $15,000, gross, or $14,600 or $14,700 exclusive of the freight. He gives the cost of a great many, if not all, of the separate things composing this outfit. He states that he was thoroughly acquainted with this property on the day of the fire, and was familiar with its value at that time, having bought and sold furniture for nearly five years in Tavares, and having stayed in the hotel nearly all the time up to a short time before its destruction, and had, several days before the fire, taken a Mr. Roost over the entire building, with the view of renting it to him for the ensuing year, and therefore examined everything but a few days before the fire. The furniture, he says, was

9.

in complete condition, there was but one bedstead in the entire furniture that was hurt; that was on the fourth floor. Some Englishmen got on a frolic and broke it where those locks go into the sides. That was the only thing that was not in absolute perfect condition. . "I estimate the value of the entire outfit on the day of the fire at $10,000. I delt in furniture for four years, and know what the price is, and I will state I could have sold the furniture in my store for over $10,000.

He states that the counters, shelving, etc., in the first store cost $1,150 or $1,200, and shows his familiarity with them. He does not state their value; gives the cost of the life preservers, maps and harness as $2,000, and their value at the time of the fire at $1,000; that he purchased the entire outfit of printing material in Cincinnati, and published and edited the Tavares Herald for several years; that it cost $1,600 there, and part of the furniture for it he had made at Tavares at a cost of about $100, and he estimates the value of this property on the day of the fire at $1,200; a large amount of the type had never been used.

W. P. Floyd, a carpenter, who says he superintended the work of enlarging the hotel, he having had charge of the carpenter and mason work, testifies that he made an examination of the original building before enlarging it, and found the sills sound and the plastering good, and says all heart pine was put in the new building as near as he could get it, the lumber being selected and the framing being sawed out especi-

ally for it.   He describes the building and material fully, saying that between $3,600 and $3,700 were paid for carpenter's work alone; that very little repair had to be made on the building up to the time of the fire, and that he had charge of the plaintiff company's work up to that time.   No repairs outside of a pane of glass, or some little thing about the water closet, or something like that.   The building was in good condition at the time of the fire.   He also describes the counters and shelving of the corner store, which counters and shelves he regards as being elaborate, and a good solid job, and in good condition on the day of the fire so far as he knew, which counters and shelves he estimates, from his practical knowledge of building them, as worth $3 to $4 a running foot on the day of the fire, and that other counters of not so fine a quality, were worth $2 per foot.   He did his trading in the store, and was there "every day or evening."

J. H. Sears, a practical carpenter and builder of 44 years experience, and who has done building in Florida for about two years before the fire, and at Tavares, and is familiar with the price of lumber, building material and labor, upon being given specifications, diagrams and photograph as descriptive of the hotel, was asked to state what it would have cost the plaintiff to have such a building constructed on the 9th day of April, 1888, the day of the fire.  The question was objected to as not stating a proper hypothetical case to be submitted to the jury under the facts of the case at bar, and as too indefinite, and offering too wide a latitude,

and not confining the estimate of the witness to a defi-
nite building, and as misleading, incompetent and irrel-
evant; but the objection was overruled and exception
taken.    His reply was $35,637.17, including 15 per cent.
for builders' commission, or $31,207.82, exclusive of
such commissions; that he lived in the building more
than a year, and that the character of the construction
was very fine and good ; had occasion to notice the
character of the construction, as a builder he generally
looked out for such things, had taken no particular no-
tice of the plastering on the walls, but knows it was a
good job, and noticed that in burning down the board-
ing had burned off the frame-work leaving the skeleton,
the walls standing and the frame-work burning, and it
fell piece by piece, showing it was thoroughly put up
and solidly constructed ; that he was in the building at
times other than when he lived in it, had no other place
to sit around except on the piazza in the evenings; that
he spent much time there, went inside, occupied three
different rooms when he lived there, and had been over
the building or through it, except the upper story
which he was never in, and "has sufficient personal
knowledge of the building to be able to give an esti-
mate of its value on the 9th of April, 1888.    That the
condition of it on the day of the fire and prior was
about perfect.    In reply to the question now put to
him as to his estimate of the value of the building on
the day of the fire, he replied: "I have been used to
adjust fire losses north, and am pretty well posted.
That building was worth $35,637.17 on that day of the

fire." He, in reply to a subsequent inquiry, said he would not take the contract to put up the building on that day for $31,000. He also stated that it would have cost $3,500 to $4,000 to construct the corner store building on the day of the fire, and that from his knowledge of its condition it was then well worth $2,600, and that the second store, with the condition of which he was well acquainted at the time of the fire, it being good, was worth $1,300.

W. A. Miller, a contractor for buildings of all kinds, who has been engaged in the business for five years, and lives at Sanford, Florida, and was familiar with the price of material and labor in 1888, and at the time of the fire, stated in answer to a question like the first given above as propounded to Sears, the same objection and ruling and exception being made, said it would have cost $30,000, and that there would have been no deterioration in such a building in two years.

G. E. Pearce, a contractor for thirty years, and for eight years in South Florida, and familiar with the cost of labor and building material in April, 1888, replied to the same question, under the same objection, ruling and exception, that it would have cost $27,964.20; that he had a personal knowledge of the price of lumber and woodwork, and some acquaintance with the building, had been in it, but his knowlege of the building did not aid him in making the estimates; that there would have been 5 per cent. depreciation in the building for the two years in that locality, and supposing one-third of it had been constructed in 1882,

134 SUPREME COURT.

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

that one-third would have depreciated over 10 per cent., but not if it had been thoroughly repaired in 1886.

W. T. Cotter, a witness for defendant, carpenter and builder of all kinds for 25 years, and has built all classes of buildings in Florida, in answering the same question, put the estimate at $18,000, and says he would have built it for this price; and that the corner store could have been built for $2,500, correcting a previous estimate of $4,000; and that the second store could have been built for $1,000. He states the depreciation of buildings in Florida to be from 5 to 7 per cent.

J. K. Barrett, a witness for plaintiff, who was, in charge of the hotel from December, 1885, to April 20th, 1886, it having been refitted after he took charge, and has been in the hotel business twenty years, describes the furniture and outfit, and estimates its value as of that time at from $7,000 to $7,500.

E. S. Newell, a witness for defendant, and steward in the hotel from December, 1887, to February 22d, 1888, considers $3,000 a very liberal estimate of value. He says furniture in hotels when the lease changes at short periods depreciates from 20 to 25 per cent.

D. S. Randolph, the lessee of the hotel from December, 1887, up to the time of the fire, says the lease was at $100 per month, he to put in all repairs; that when he rented, Mr. St. Clair Abrams said the house was in such bad condition he thought of shutting it up, and would not put in any repairs. His estimate of the value of the furniture is $2,575, and says the annual

depreciation of furniture in hotels is 20 to 25 per cent. and upwards; that the linen depreciates 50 per cent.

There is an irreconcilable conflict between Newell and Randolph on the one side, and Mr. St. Clair Abrams on the other, as to the quantity, quality and condition of the furniture in the hotel, but it is sufficient, without mentioning particular points in which other witnesses sustain the last named witness, to say that the jury has settled this. Mr. St. Clair Abrams also states that the terms of the lease had been changed to a percentage on the gross income over a certain sum, which is denied by Randolph. Randolph also stated that a great many panes of window glass were out, and that the house leaked.

The amount which it would have cost to erect buildings of the same kind on the day of the fire, less a proper deduction for deterioration, is not the proper measure of damages in a case of this kind. In Burke vs. L. & N. R. R. Co., 7 Heiskell, 451, where the plaintiff's dwelling and contents had been destroyed by fire communicated by sparks from the railroad company's locomotive, the jury were instructed that the measure of damages would be just what it would cost in cash at the time and place of the burning to replace the house and each article consumed in it. This was held to be inaccurate, and calculated to produce confusion in the estimate of damages, and the better instruction to be that the measure of damages would be the value of the property destroyed at the time and place of the destruction. In L. B. & M. R. Co. vs.

Winslow, 66 Ill., 219, a case of condemnation of private property for railroad purposes, the company having taken the land and destroyed the buildings upon it, it is said: For all the property of appellees taken by the corporation for their use, just compensation must be made to the owners. If a building stands in the way of a road which it is necessary to destroy, its value must be paid by the corporation, and the jury in estimating its value will take into consideration not the value of the materials composing the building, but the value of the building as such.

The value of the property at the time and place of the fire, is the question the jury is to pass upon. This court charged and the plaintiff admitted. Market value is what a thing will sell for, P. & N. Y. R. Co. vs. Bunnell, 81 Penn., St., 414. To make a market, however, there must be buying and selling. Blydenburgh vs. Welch, 1 Baldwin, (U. S. Ct. Ct., 340. Property may have a value for which the owner may recover if it be destroyed, although it have no market value. A. T. & S. F. R. Co, vs. Stanford, 12 Kan., 354, 380. "Suppose," asks the court in the case just cited, "a rod of railway track, or a shade tree, or a fresco painting on the walls or ceiling of a house, or a bushel of corn on the western plains, should be destroyed; could there be no recovery for these articles simply because there might be no actual market value for the same? To fix the market value of a thing, it seems to us that there must be a selling of things of the same kind. If there had ever been a sale of a hotel,

or of any other building in Tavares, we are not informed, and we have no judicial knowledge, nor does the record inform us, that hotels have a market value there. Yet, though there is no market value or standard value, the plaintiff should not be allowed more than the property destroyed by fire on the 9th of April, 1888, was reasonably worth in Tavares. To do this it is proper to invoke the aid of all facts calculated to show its value, and we are unable to perceive that the Circuit Judge erred in admitting the evidence of the cost of replacing the building on the day of the fire. It was a fact tending to show, and to be considered with others, by the jury in determining what amount of money would put the plaintiff in the position in which he was at the time. If there were any other facts incident to the condition of Tavares, considered in a business or other point of view, calculated to affect the value of this or any other property there, and which would qualify or outweigh the item of the cost of restitution, and such facts do not appear in the record, we are not responsible. It must be assumed there were none other existing. By saying the testimony was admissable, we do not say what weight should be given it, nor do we come into conflict with the Tennessee and Illinois cases last mentioned. The evident meaning of those cases is, that the cost of restitution or of the materials is not the measure of damages governing the jury, and not that such facts can never be considered in arriving at the true value or measure of damages. If an article has no market

value, its value may be shown by proof of such elements or facts affecting the question, as exist. Recourse may be had to the items, and its utility and use. 2 Sutherland on Damages, 378. In Luse vs. Jones, 39 N. J. (Law), 707, the plaintiff was permitted to show cost of a bedstead as tending to prove its value. This cost was the price at which a regular dealer in such articles had sold it when new in the ordinary course of trade. "A sale so made," said the court, "was evidence of the market value of the thing when new, and the value of such goods when worn can scarcely be ascertained except by reference to the former price and the extent of the depreciation. Of course the cost alone would not be a just criterion of the present value, but it would constitute one element in such criterion, and the attention of the jury was directed to the importance it deserved to have. See also Sullivan vs. Lear, 23 Fla., 463, 474. In Whipple vs. Walpole, 10 N. H., 130, it was held it was admissable to prove what horses like those lost or injured cost at a town near the place where the loss occurred. Upon the same principle, and for even stronger reasons, we think that the cost of restitution at the time of the destruction of the building was an element which might be considered by the jury with others in ascertaining value.

The suggestion of appellant's brief that what a building is used for, whether it was a home or a business house, what income was derivable from it, where was it located, what its surroundings, enter into the con-

sideration of value, are as to the hotel, met by the evidence in this case, and except as to that of income, the same may be said of the other buildings.   Whether or not any of the buildings were profitable as investments at the time of the fire, the defendant could, if such evidence was admissable, have elicited on cross-examination of plaintiff's witnesses, or by independent testimony, as might have been proper under the circumstances, and the same may be said also of the suggestion as to the "prospects" of these properties and of the value of other property in the vicinity, and of the land after the houses were burned.   "What were the whole premises worth in the market as they stood at the time of the fire," is, if, we substitute the words "at Tavares," for "in the market," the question really submitted to the jury for decision.

The question of value in cases where, as here, there is no market value, is one peculiarly for the jury. Nothing has been permitted to go to this jury which it was improper for them to consider in coming to a conclusion as to the value of the several kinds of property involved.   It cannot be assumed that there were other persons who would have testified to facts or circumstances other than those shown by the record, of a character to influence the jurors to a lower estimate of the values, or have themselves placed a less value on the property.   The jury has returned a verdict according to its judgment, and it is undeniable that they have not given the plaintiff the benefit of the several values insisted upon by the plaintiff's chief witness, but it is

apparent that after considering all the facts and circumstances, and testimony, the jury has said what they deemed the property to be worth, falling considerably below the aggregate of that witness' opinion. There was, in our judgment, sufficient evidence to sustain the verdict, and we fail to find in the brief any contention that the verdict should be reversed as being excessive. If there were such contention we could not sustain it.

VIII. Upon the question of the allowance of *interest* as matter of right, upon the amount of damages found by the jury, from the date of the destruction of the property in cases like this where the damages sued for are unliquidated, the following authorities, with others that we have examined, hold in effect, "that the jury *may*, at their discretion, allow and include interest in their verdict *as damages*, but not as interest *eo nomine:* 2 Sedgwick on Measure and Damages, p. 190; authorities cited in note to Shelleck vs. French, 6 Am. Dec., 197; Black vs. C. & A. R. R. & Trans. Co., 45 Barb. (N. Y.), 40; Central Railroad vs. Sears, 66 Ga., 499; Lincoln vs. Claffin, 7 Wall., 132; Garrett vs. Chicago & N. W. Ry. Co., 36 Iowa, 121; Brady vs. Wilcoxen, 44 Call., 259. In all these authorities no other reason is given for this rule than that it has been so held in other cases that have gone before them; except that in a few cases it is put upon the ground that where property is wrongfully taken and withheld, the defendant gets the benefit of its use during the detention, and is required to pay interest as compensation for such use, when in cases of property wrongfully destroyed the de-

JANUARY TERM, 1891.    141

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

fendant derives no benefit therefrom.    The answer to this theory is, that in cases of this kind for the negligent and wrongful destruction of property the issue as to the amount of the compensation does not depend upon *benefits* that accrued therefrom to the *defendant* whose negligent act brought about the destruction; but the issue rests wholly upon the question as to what is the sum of the *damage to the party whose property has been destroyed*.    Neither do we think this theory can properly be applied even in cases of trespass and trover.    Interest on the value of the property taken in those cases cannot correctly be said to be allowed to the plaintiff "because the defendant derives benefit from the use of the property," but is allowed to the plaintiff to compensate *him* for *his deprivation* of its use during the detention thereof. Suppose in this case the furniture in this hotel, instead of being destroyed, had been wrongfully taken by the defendant, and had been carried away and disposed of at once by gift to other parties, or had been destroyed by fire or otherwise after the taking, so that it really derived no benefit therefrom; in an action for the recovery of its value interest under the modern authorities would be recoverable as matter of legal right; but in such case would the subsequent gift or destruction thereof and absence of beneficial use to the defendant have any effect upon the right to the recovery of interest.    The answer in the negative is self-evident.

In Ancrum vs. Slone, 2 Spears (So. Ca.), 594, in which this question of interest is discussed at greater

length than in any case we have examined holding this view, Frost Judge, says: "To the argument, if interest may be allowed in the aggregate damages found by a verdict, why·may it not be allowed *eo nomine*? The reply is, the law does not inquire into the particulars of a verdict for damages, and in some. cases interest furnishes a just and convenient measure for the jury. But it is a stated. compensation for the use of money, and as it cannot be separated, even in idea, from debt, seems not properly incident to uncertain and contingent damages. The distinction is admitted to be one of form, depending on the form and cause of action. It is necessary and obligatory by law, to maintain the forms of action, with the distinctive rules which govern them. If this argument is not allowed to be decisive, there is no reason why assumpsit should not be brought on a sealed instrument, or one form of action serve alike for all contracts as well as torts. Besides, in actions sounding in damages, the liability, amount and time, necessary incidents for the allowance of interest, are not ascertained and determined until the verdict is rendered. Interest being stated damages on pecuniary liabilities, to find a sum with interest in an action sounding in damages, is to allow damages on damages, which is an incongruity." The·pith of the argument here is, that the distinction grows out of and depends upon the "form" of action, and that it is necessary to maintain the "forms of action" with the distinctive rules which govern them. We cannot give our consent, that mat-

JANUARY TERM, 1891.        143

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

ters of substance founded upon right shall be thus made subservient to the maintenance of the mere forms of action; or that money which rightfully belongs to a party shall be given when called by the name "damages," and witheld if chanced to be called "interest." In Parrott vs. Knickerbocker Ice Co., 46 N. Y., 361, the court says: "In cases of trover, replevin and trespass, interest on the value of property unlawfully taken, or converted, is allowed by way of damages, for the purpose of complete indemnity of the party injured, and it is difficult to see why on the same principle, interest on the value of property lost or destroyed; by the wrongful or negligent act of another, may not be included in the damages." In the case of Ancrum vs. Slone, *supra*, the court says: "It is necessary to the allowance and estimate of interest to ascertain the sum due and the time when payable." At what time does the *liability* for the negligent destruction of property *attach* to the wrongdoer, if it shall be found that all things concur to set such liability in motion ? It has been sometimes contended that such liability *attaches* only upon the finding of the jury. We do not think so. The verdict of the jury simply *declares* the liability and fixes the amount. The *law attaches* the liability *at the time of the destruction* if all the circumstances attendant thereon concur in stamping the case with the legal elements of liability. As before seen, the measure of the loser's damage is the *value* of his property destroyed at the time of its destruction. Why at the time of destruction ? Be

cause it is at that time that the destroyer becomes liable
for such value. The loser, before and at the time of such
destruction, was entitled to his property, and the bene-
ficial use of it, and instantly, upon such destruction,
becomes under the law entitled to its value in money at
the hands of the wrongdoer, and can sue instantly for
such value. Because, through the law's delays, no op-
portunity is afforded to have the amount of that value
*declared* by a jury for a year, perhaps several years, is
it right that the loser shall during all that time be kept
out of both his property, its use, and its value without
some remuneration for the retention by the wrongdoer
of such value? Upon every principle of right we can-
not think so. The theory of the measure of liability
in such cases is *just compensation.* We cannot see
either justice or completeness of the compensation dis-
pensed under a rule that declares a party who wrong-
fully destroys another's property to be liable at the
time of such destruction for the value thereof, but that
permits the wrongdoer to withhold such value for years
without some compensation for such retention. We
cannot appreciate the force of the argument of the
learned judge in Ancrum vs. Slone, *supra,* "that to
allow interest in an action for damages, would be to
allow damages on damages." It is true, that in a cer-
tain sense it is an allowance of damages on damages,
(interest being a species of damages,) but it is not an
allowance of damage on damage, for the same *cause* of
damage. In the one case the principle sum—the *value*
of the property destroyed—is awarded as the damage

for the wrongful destruction ; in the other, interest is allowed as the damage for the wrongful detention of such value. In Chapman vs. Chicago & N. W. Ry. Co., 26 Wis., 304, Chief-Justice Dixon says: "In trespass, trover or replevin for the same property, taken or converted by the defendants, such would have been the legal rule of damages ; or rather the value with interest from the time of the taking or conversion. Why should not the same rule prevail in this action ? We are at a loss to assign any good reason for the destinction, if it can be said that it exists, or if it can be said to be in the discretion of the jury to give interest by way of damages in this case, whilst in the others they must give it as a matter of strict legal right. We say we can see no good reason for the discrimination. The object of the rule, or of any rule of damages in any of the cases, is to give just and full compensation for losses actually sustained.

It is obvious, regard being had to such compensation, which constitutes the foundation of the rule, that the giving of interest is as essential in this case as in any of the others. It is immaterial to the party who has lost his property, whether it has been taken and converted, or negligently destroyed by the other. His loss is the same in either case, and in either case he should be entitled to the same compensation." This view of the law accords fully with ours, and seems to be sustained also by the following authorities : 1 Sutherland on Damages, 174; F. E. & M. V. R. R. Co. vs. Marley, 25 Neb., 138; Mote vs. Chicago & N. W. R. R.

Co., 27 Iowa, 22 ; Sayre vs. Hewes, 32 N. J. (Eq.), 652;
Derby vs. Day & Gallup, 5 Minn., 119.   In the case of
Milton vs. Blackshear, 8 Fla., 161, decided in 1858, re-
lied upon to establish a contrary view, the question
under discussion was not involved.   The action in that
case was upon an account for lumber sold and deliv-
ered; and there is nothing in the decision that conflcts
with the views here expressed.   Neither do we find
anything in our statute that is inconsistent therewith.
Our statute, sec. 1, p. 585, McClellan's Digest, (Chap-
ter 1483, Laws of 1866,) provides as follows : "The le-
gal rate of interest to be charged on all notes, money
*or other liability of whatsoever character*, and upon
all judgments, shall be eight per centum."   In view of
the charges given, we must assume that they were
heeded by the jury, and that they included interest in
their verdict from the date of the fire to the day of
their finding upon the amount found by them to be
the value of the property destroyed, which value by
arithematical rules we find to be in round numbers
forty-five thousand and some hundred dollars, the re-
mainder of the verdict of $52,909.03 represents interest
found by the jury for the period of two years and sev-
enteen days intervening between the fire and the ver-
dict.   The established measure of damage in such
cases being complete compensation, we feel that it
would be doing a positive wrong to the plaintiff were we,
because of these instructions on the queestion, to order
either a new trial or a *remittittur* of this sum to which,
upon every principle of right, the plaintiff is justly en-

JANUARY TERM, 1891. 147

J. T. & K. W. Ry. Co. v. P. L. T. & M. Co.—Opinion of Court.

titled. The errors assigned for giving the above quoted 21st and 8th instructions on the subject of interest and measure of damage, and for the refusal to give the above quoted 28th, 29th and 30th instructions asked for, cannot be sustained.

IX. It is claimed that the court erred in giving to the jury the 7th instructions reqested by the appellees, which is as follows : "That if the jury believe from the evidence that the defendant, or the defendant's agent at Tavares, had knowledge of the condition of the streets, and of the sidewalks, and had knowledge that there was trash on or under the sidewalks, and that the sidewalks were of inflammable material, such knowledge can be considered by the jury in connection with the question of negligence in permitting the emission of sparks in large and dangerous quantities and of unusual size from the locomotive, if the jury believe from the evidence that such sparks were emitted." (Assigned as the 108th error.) The effect of this charge, though framed with cautious ingenuity, was to say to the jury: "That in considering the question of negligence on the part of the defendant company, the knowledge of the company's agent at Tavares of the inflammable condition of the sidewalks, could be regarded as the knowledge of the defendant company, and that such knowledge might be regarded as an element of negligence." It is now no longer an open question, but well settled, that notice to an agent, to be binding upon his principal, must be concerning some

fact within the scope of the powers and duties of the agent as such. To charge the principal with the knowledge of his agent, it must be concerning some fact connected with the particular duties that the agent is authorized to perform for the principal. Story on Agency, sec. 140; Hiern vs. Mill, 13 Vesey, Jr., 114; 1 Parsons on Contracts, 77, and authorities cited in note x; 1 Rorer on Railroads, 669; Fulton Bank vs. N. Y. & S. Canal Co., 4 Paige, 126; Congar vs. Chicago & N. W. Ry. Co., 24 Wis., 157; Bank vs. Davis, 2 Hill, 451; Winchester & Lemmon vs. Baltimore & S. R. R. Co., 4 Md., 231; Bank of St. Marys vs. Munford & Tyson, 6 Ga., 44.

We are not satisfied, in the absence of some definite evidence or better knowledge than we have, assuming that such knowledge can be invoked, as to the extent of the duties of a local or station agent, that notice to this agent was in law notice to the company, and therefore to the engineer managing the train, and though the charge may be erroneous, we do not think it could have had any material effect on the conclusion of the jury as to the question of negligence.

The question of negligence in this case, as shown by the discussion of it in the second paragraph of this opinion, resolved itself into one of the relative veracity of the witnsses of the plaintiff, and those of the defendant, upon the issue of the emission of sparks as claimed by the plaintiff, and the presence of a proper

spark-arrester and its proper management as claimed by the defendant. The jury have shown by their verdict that they believed the testimony given by plaintiff's witnesses, as to the escape of the large quantities of sparks, or coals, and cinders of extraordinary size, and did not believe the defendant's contention. This conclusion results necessarily from the verdict, because a verdict finding negligence, as this impliedly does, could not have been reached and cannot be maintained on any other theory. The escape of such sparks was conclusive evidence that there was either not a proper spark-arrester, or that it was not properly managed, and the absence of such an arrester, or of proper management, established, of itself, negligence in the defendant. As the jury believed this testimony, it is altogether unreasonable to say that the charge under consideration could have influenced the verdict. Negligence was necessarily made out without its supporting influence, and could not have been made out without the evidence referred to and the belief thereof. The above testimony, believed as it was, precluded entirely any other verdict on the question of negligence than the one reached; and if the admission of the testimony on which the charge was based, which testimony showed that the local agent had knowledge as to the trash and sidewalks, had been excepted to, and the question before us was the propriety of its admission, we should be compelled to say that it was error without injury,

and our conclusion as to the charge is the same. The jury could not have found the verdict without believing plaintiff's witnesses, yet this charge could have had no effect in the formation of this belief, and this being so; it had necessarily no effect upon the finding of negligence, the only point to which it related. Knowledge by the company, or the engineer managing the locomotive, of the alleged condition of the streets and sidewalks, might, in the minds of the jury, have aggravated the degree of negligence to wilful injury, but the escape of the sparks of the size and in the quantity indicated, made a case of negligence under the circumstances existing, independent of any consideration by the jury of knowledge or ignorance of the company or its agent.

X. The 113th error assigned is the giving of the 14th charge requested by plaintiff below, as follows: "That in cases of this kind, the jury have the right to infer negligence from the circumstances of the case; that circumstantial evidence alone would authorize the finding of negligence, and that the jury have the right to presume from the escape of sparks in large and dangerous quantities, and of unusual size, from the smokestack of the locomotive engine, and at different times from this same engine, that the engine either did not have the most approved appliances to prevent their escape, or that the said appliances were not properly adjusted so as to prevent their escape, or that the en-

gine was not handled or operated in a proper manner and with due care and vigilance.'' The merits of the proposition of law involved in this instruction have already been fully discussed in another part of this opinion, wherein it is held that the testimony of the plaintiff's witnesses to the effect that sparks and burning cinders of unusual size and in unusual quantities, were in fact emitted from the defendant's engine, as against the evidence of the defendant's witnesses that the engine was in perfect condition and skillfully handled, presented a simple question of veracity between the opposing witnesses, that was for the jury alone to settle; and, from what has been said, we cannot see that this charge is obnoxious to the law upon the subject, but on the contrary, enunciates the principle correctly. We cannot discover therein any enroachment upon the province of the jury to deal with the facts. It instructs the jury in effect that from certain circumstances mentioned, they can, under the law, arrive at a mentioned result. It does not trench upon the facts by the assertion that any mentioned fact or circumstance does exist, or has been established; nor does it undertake to assert that the result therein mentioned has been reached, or should be established by the jury. We think the charge is fully sustained by the cases cited *supra*, Burke vs. L. & N. R. R. Co., and A. T. & S. F. R. R. Co. vs. Bales.

XI. The refusal of the court to permit defendant's

witness, L. L. Dupont, to be interrogated as to what he *heard* other parties at the fire say in reference to its origin, is also relied upon as error. It seems that the witness Dupont was in Tavares on the morning of the fire, and that on hearing the alarm of fire, he went to the scene of its origin at Lester's saloon and there *heard*, but did not see for himself, how it originated. We think the court properly excluded any detail of what others may have said in this witness' presence as to how the fire originated.

The origin of the fire was an independent, isolated fact, standing out by itself alone, that was necessary to be proven by direct, independent facts or circumstances, and a knowledge of such fact is possessed by any person, such person should have been produced and his knowledge thereof detailed under the sanctity of an oath as a witness on the stand. To have permitted the witness Dupont to state what *he heard* some one say was the origin of the fire would have been to admit hearsay evidence pure and simple. Greenleaf, sec. 108, vol. 1, in discussing the exceptional cases wherein hearsay evidence is sometimes permitted, says: "The principal points of attention are, whether the circumstances and *declarations* offered in proof were cotemporaneous with the main fact under consideration, and whether they were so connected with it as to illustrate its character." The attempt here was not to introduce declarations or circumstan-

ces connected with, or a part of, or that illustrated the character of the main fact necessary to be established, but it was an effort to prove the main fact itself by hearsay, which fact, as before stated, stood independent and alone. The object in having this witness to testify that he heard some one at the fire say how it originated, was evidently for the purpose of establishing the fact that the fire's origin was other than sparks from defendant's locomotive. Suppose the witness had been allowed to so testify, what would it have proved? Clearly it would have proven nothing more than the bare fact that he *did so hear*; but this certainly could not be claimed as an establishment of the *truth* of whatever it was that he did hear.

In this connection it is also contended that the court, in plaintiff's favor, committed the thirty-third error assigned, in permitting the plaintiff's witness J. H. Sears, to relate a remark that he, Sears, himself, made at the time he and one Terry were trampling out large coals of fire along the sidewalk, to-wit: "I remarked that if there were any coals underneath the plank walk we would soon have a blaze." "The wind was blowing quite fresh at that sime." And it is contended that the admission of this remark in evidence was the same in character as the testimony sought to be drawn from the witness Dupont. Where the parallelity or similarity lies between the two propositions, either in substance, or effect intended to be produced, we are

wholly at a loss to discover. The attempt, with the witness Dupont, was to have him testify to what he heard another party say, in order to prove the origin of the fire. With the witness Sears, he was allowed to rehearse to the jury an observation or remark that he himself made as to the probability of a blaze "if there were any coals underneath the plank walk," such as he, at the time of the remark, was trampling out. And he gives as reason for the remark, "that the wind was blowing quite fresh at the time." In the case of Dupont, hearsay evidence was attempted; in the case of Sears, he was allowed to rehearse an oral observation made by himself, that was prompted by the surrounding circumstances at the time, of wind, dry weather, inflammable sidewalks, &c. If Sears in the jury's presence had stated that "he knew or thought at the time, from the surroundings, of fresh wind, inflammable sidewalks and dry weather, that there would be a blaze if any of those coals were underneath the walk," it would have amounted to the same thing in substance and effect as the rehearsal of his formerly made oral remark. Under the strict rule of evidence, this observation of Sears' should have been excluded, not upon the ground of its being hearsay, as was DuPont's, but because it was the expression of his opinion. But, in the light of the other legal, and with the jury convincing, testimony in the case, establishing the correctness and truth of Mr.

Sears' observation, we cannot see that the re-statement of that observation to the jury could possibly have been productive of any harm to the defendant.

XII. Another error assigned is the admission of certain evidence of one G. W. W. Davis, over defendant's objection. The objection was that his testimony was the same as that of certain of plaintiff's witnesses who had testified before the defendant's witnesses, and that it was not admissible in rebuttal.

The authorities hold that it is within the discretion of the trial court to permit a plaintiff who may before resting have introduced enough testimony to make out a *prima facie* case, to introduce, after the defendant. additional proof in chief, as distinguished from proof in rebuttal, and the exercise of this discretion is not assignable for error except in cases of manifest abuse. Thompson on Trials, secs. 343-347. We do not see that there has been any abuse of discretion in this case. In view of the character of the defense on the question of negligence, and the fact that the decision of this question became one of the mere credibility of witnesses, we think the judge properly exercised that discretion in permitting additional witnesses to those first used, to prove the escape of sparks by the same engine, either at the same or other points, that morning. It does not appear that the defendant was placed at an unfair position, or suffered any disadvantage from the mere fact of these witnesses testifying

after the defendant had put in its case. No exercise of discretion unfairly as against the defendant on this line is shown.

XIII. There is sufficient testimony to sustain the verdict, and while there is on some points such conflict between plaintiff's witnesses and those of the defendant as makes this peculiarly a case in which an appellate court cannot interfere, or disturb the finding of the jury, there is no such inconsistency or conflict, or unnaturalness in the testimony of the plaintiff's witnesses as can cause it to be said that no jury could believe them. Their credibility was a question for the jury. Interest in or connection with other suits of the same character against the defendant, are circumstances affecting the credibility of witnesses; they do not disquality the witnesses, but constitute a consideration with which the jury, and not the court, have to deal and have dealt.

The member of the court whose name appears at the head of this opinion, feels it is due to his associate, Mr. Justice Taylor, to say that he prepared about the same number of the subdivisions of this opinion as were prepared by such member.

The judgment is affirmed.